**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

v.

**ADMINISTRATOR, ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION, et al., Defendants.**

**Civ. A. No. 76–1691.**

United States District Court, District of Columbia.

May 8, 1978.

---

Ronald J. Wilson, Barbara B. Graham, Washington, D. C., John Roger Beers, Helen M. Linker, Palo Alto, Cal., for plaintiffs.

William M. Cohen, Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

Plaintiffs are the Natural Resources Defense Council, Inc. (NRDC), Oregon Environmental Council, Friends of the Earth, and Environmentalists, Inc., as well as one individual. They bring this suit to challenge the Energy Research and Development Administration's (ERDA) failure to apply for and obtain licenses under section 202(4) of the Energy Reorganization Act of 1974, 42 U.S.C. § 5842(4) (Supp. V 1975) (hereinafter, the 1974 Energy Act), for the construction of 22 high-level radioactive waste storage tanks at the Hanford Reservation in Richland, Washington, and at the Savannah River Plant in Aiken, South Carolina (Count I). Plaintiffs also challenge the failure of the Nuclear Regulatory Commission (NRC) to assume jurisdiction and exercise its licensing authority under section 202(4) over the 22 ERDA tanks in issue (Count III). Finally, plaintiffs challenge ERDA's decision not to prepare site-specific environmental impact statements (EIS's) under section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) (1970), with respect to the ERDA tanks in issue (Count II). This case is now before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment, and on plaintiffs' cross-motion for partial summary judgment. For the reasons hereinafter stated, the Court will grant defendants' motion for summary judgment on Counts I and III and grant plaintiffs' motion for summary judgment with respect to Count II.

### II. BACKGROUND

The Federal Government has since 1945 generated substantial quantities of high-

level radioactive waste in connection with, *inter alia*, (1) nuclear weapons production, (2) nuclear research and development, and (3) nuclear fuel reprocessing (chiefly from naval vessels). Most of these wastes have been generated and stored at ERDA facilities at Hanford and at Savannah River.[1] These wastes contain varying quantities of highly toxic and long-lived radionuclides, including plutonium–239, strontium–90, and cesium–137. The Government will continue to produce such high-level radioactive wastes for the foreseeable future, and, for at least the next 15–20 years, it intends to continue storing such wastes in ERDA facilities primarily at Hanford and Savannah River.

ERDA considers its present program for the management of such nuclear wastes at Hanford and Savannah River to be an interim program. It is presently in the process of researching, testing, and developing suitable methods for the ultimate storage of these wastes, including the use of geologic repositories, and it presently anticipates that it will select and implement a program for the ultimate storage of Government-generated radioactive wastes sometime during the years 1994–2000. In the meantime, new storage tanks are required both to replace deteriorating tanks and to store newly generated wastes.

The 22 storage tanks at Hanford and Savannah River here in issue were authorized by appropriations acts for fiscal years (FY) 1976 and 1977. ERDA Projects 76–8–b and 76–8–a respectively authorized 6 tanks at Hanford and 6 tanks at Savannah River; ERDA Projects 77–13–e and 77–13–d respectively authorized 6 tanks at Hanford and 4 at Savannah River. The 12

FY 1976 and the 10 FY 1977 tanks are now undergoing construction. The 6 FY 1976 tanks at Hanford are scheduled for completion in 1979, and both the FY 1977 Hanford tanks and all the Savannah River tanks are due to be completed in 1980. All 22 of these tanks are double-shell, stress-relieved carbon steel tanks which will be constructed in underground vaults.[2] These tanks were designed in an attempt to eliminate the waste leakage that has occasionally occurred from some of the existing tanks in the past, particularly as a result of "stress-corrosion cracking."

In May 1975, ERDA determined not to prepare impact statements for the FY 1976 tanks, and it thus issued "negative declarations" with respect to both the Hanford and Savannah River projects. *See* 40 Fed.Reg. 22,165–66 (May 21, 1975). On August 7, 1975, plaintiff NRDC submitted to both ERDA and NRC a memorandum in support of its contention that the 12 FY 1976 tanks should be licensed under section 202(4) of the 1974 Energy Act. That same day, NRDC formally protested ERDA's decision not to prepare EIS's on these 12 tanks.

On September 9, 1976, plaintiffs filed the initial complaint herein. Then, on September 14, 1976, NRC notified NRDC that it had determined that the licensing requirements of section 202(4) of the 1974 Energy Act did not apply to the FY 1976 tanks at both Hanford and Savannah River. In the fall of 1976, ERDA decided not to prepare EIS's for the FY 1977 tanks, and it thus again prepared "negative declarations" with respect to both the Hanford and Savannah River projects. *See* 41 Fed.Reg. 38,209 (Sept. 9, 1976); 41 Fed.Reg. 48,398 (Nov. 3, 1976).[3] Plaintiffs then filed the

1. A small proportion of Government-generated nuclear wastes are presently stored at the Idaho National Engineering Laboratory (INEL) in Idaho Falls, Idaho.

2. The Hanford and Savannah River tanks are of similar design. The only material difference between them appears to be that the Savannah River tanks will contain cooling coils to reduce the temperature of the wastes after they are processed.

3. In making these determinations, ERDA relied upon the environmental analysis contained in

the Hanford and Savannah River programmatic EIS's on ongoing waste management practices. ERDA's programmatic EIS covering ongoing waste management practices at Hanford was prepared as a result of a suit filed by plaintiff NRDC and others in the Eastern District of Washington in August 1973. *NRDC, et al., v. Dixy Lee Ray, et al.,* Civil Action No. 3924. The scope of that suit and its effect on the instant litigation are more fully discussed in section IV, *infra.*

amended complaint herein on November 8, 1976.

After plaintiffs' amended complaint was filed, NRDC, on December 10, 1976, again wrote to NRC, this time requesting NRC to reconsider its decision not to license the FY 1976 tanks and further requesting NRC to license the FY 1977 tanks. On March 31, 1977, NRC issued a final Memorandum and Order which reaffirmed its "earlier determination that the ERDA waste tanks authorized by FY 1976 are beyond the scope of section 202(4), and [determining] that the FY 1977 tanks are similarly beyond the scope of section 202(4)."

### III. MERITS

A. *Counts I & III: The Licensing Issues*

Defendants have moved to dismiss Counts I and III of the complaint herein on the ground that 42 U.S.C. § 2239 and 28 U.S.C. § 2342(4) make the courts of appeals the exclusive forum for judicial review of NRC licensing issues. In the alternative, they have moved for summary judgment on both counts on the ground that the Hanford and Savannah River storage tanks are not within the purview of section 202(4) of the 1974 Energy Act. Plaintiffs have opposed the motions to dismiss and have filed a cross-motion for summary judgment on Count III. Plaintiffs have not, however, filed a cross-motion for summary judgment on Count I because they allege that material facts remain in dispute with respect thereto. For the reasons stated herein, the Court will deny defendants' motion to dismiss, but will grant defendants' motion for summary judgment on both Count I and Count III.

(1) *The Statutes Upon Which Defendants Rely as the Basis for Their Motion to Dismiss do not Apply to the ERDA and NRC Determinations Here in Issue.*

As a threshold matter, defendants seek the dismissal of Counts I and III of the complaint herein on the ground that 42 U.S.C. § 2239 and 28 U.S.C. § 2342(4) make the courts of appeals the *exclusive* forum for judicial review of NRC licensing issues. Section 2342(4) of Title 28 of the United States Code provides for exclusive review by the courts of appeals of "all final orders of the [Nuclear Regulatory Commission] made reviewable by section 2239 of title 42." Section 2239 of Title 42 in turn provides for such review of "any final order" entered

> [i]n any proceeding under this chapter, for the granting, suspending, revoking or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees . . . .

Defendants contend that since review of ERDA's refusal to seek licenses from NRC on the Hanford and Savannah River tanks involves the same issues that would arise from a section 2239 licensing proceeding, review is properly left to the court of appeals.

The Court finds this argument wholly untenable and will therefore deny the motion to dismiss Count I. Section 2342(4) of Title 28 vests exclusive jurisdiction in the courts of appeals *only* for NRC final orders and *only* then if such orders are entered into in a section 2239 proceeding. Since ERDA's decision not to seek licenses on the tanks in issue is not an NRC order and was not the result of any proceeding conducted pursuant to section 2239, 28 U.S.C. § 2342(4) is, by its express terms, inapplicable to ERDA's decision. Accordingly, jurisdiction to review ERDA's decision is properly vested in this Court under 28 U.S.C. § 1331 since plaintiffs' Count I claim arises under section 10 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06 (1970). *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

The Court will also deny the motion to dismiss Count III. It does not appear to the Court that NRC at any time treated

plaintiff NRDC's petitions as requiring a section 2239 proceeding. Indeed, there is no indication in the record that NRC invoked the procedures established by its own regulations, 10 C.F.R. §§ 2.100–.108 (1977), to govern section 2239 proceedings "for the granting of . . . license[s]." Accordingly, the Court concludes that the NRC's determinations at issue herein were not entered in a "proceeding . . . for the granting of . . . [a] license" within the meaning of section 2239, and jurisdiction is properly vested in this Court.

(2) *ERDA's Decision Not to Seek Licenses From NRC for the Storage Tanks in Issue was in Accordance With Law Because These Tanks Have Not Been "Authorized for the Express Purpose" of Long-Term Storage and are Thus Not Licensable Facilities Within the Scope of Section 202(4) of the 1974 Energy Act.*

Counts I and III of the complaint herein, which allege claims against ERDA and NRC respectively, both "seek ultimately to have [the 22 tanks in issue] subjected to a licensing proceeding before NRC in which the environmental, safety, and economic effects and implications of possible long-term waste storage in these tanks are fully recognized and evaluated." Plaintiffs' Memorandum of April 25, 1977, at 28. Section 202(4) of the 1974 Energy Act, which plaintiffs contend mandates the licensing of these tanks, provides in pertinent part:

[T]he Nuclear Regulatory Commission shall . . . have licensing and related regulatory authority . . . as to the following facilities of the [Energy Research & Development] Administration:

\* \* \* \* \* \*

(4) Retrievable Surface Storage Facilities and other facilities authorized for the express purpose of subsequent long-term storage of high-level radioactive waste generated by the Administration, which are not used for, or are part of, research and development activities.

Both parties agree that the wastes to be stored in the Hanford and Savannah River tanks are high-level radioactive wastes which are *not* part of or used for ERDA's research and development activities. And both parties further agree that the tanks in issue are *not* "retrievable surface storage facilities." Thus, the sole question is whether these tanks are "other facilities authorized for the express purpose of subsequent long-term storage." [4]

The undisputed facts herein show that ERDA has consistently, both in its various environmental impact statements, *see* Exhibits 39 and 95, and in its communications with Congress, taken the position that its current program of nuclear waste management, *including* the use of the Hanford and Savannah River tanks here in issue, is an *interim* program. ERDA has committed itself to and is presently engaged in conducting research, development, and demonstration of waste-storage programs in order to formulate an optimum program for the ultimate storage of high-level radioactive wastes. Thus, ERDA has represented to Congress that its present plans are as follows:

. . . [The Hanford and Savannah River tanks here in issue] are required to continue our existing programs for the safest containment of existing and future high level radioactive waste from the chemical processing plants at Savannah River and [Hanford].

The ERDA waste management program, as discussed with Congress on many occasions, provides for the interim (i. e., short term) storage of waste in a retrievable form until a suitable long-term disposal process or processes for the very large quantities of waste at the Savannah River and [Hanford] sites have been developed and adopted. Upon selection of the optimum long-term storage method or methods, the waste would be processed as necessary and transferred to a long-term storage site or stored at a

---

4. All parties agree that unless the storage tanks in issue are within the purview of section 202(4), they are exempt from licensing pursuant to 42 U.S.C. § 2140.

site analagous to a Retrievable Surface Storage Facility proposed for commercial wastes until a long-term site has been made ready.

We would expect to use the planned tanks only until ERDA can implement an approved plan for the long-term storage of the wastes. It is presently anticipated that facilities for long-term storage will be available between 15 and 20 years after construction of the tanks in question has been completed. This period of between 15 and 20 years after construction is complete will allow time to develop the disposal processes, budget for new long-term storage facilities, undergo the licensing procedures which would be required under section 202 of the Energy Reorganization Act and construct and start up such long-term storage facilities.

S.Rep. No. 94–514, 94th Cong., 1st Sess. 76 (1975) (Conference Report on 1976 ERDA Appropriations).

Plaintiffs do not dispute the veracity of ERDA's representations concerning its *present intention* to choose an ultimate, long-term nuclear waste management program in the next 15–20 years. Rather, they propound a multifarious argument as to why, *notwithstanding* ERDA's present intent, the Hanford and Savannah River storage tanks are in their view "facilities authorized for the express purpose of long-term storage." Relying upon assorted fragments of legislative history, plaintiffs interpret "long-term storage" to include any storage in excess of 20 years, and they interpret "authorized for the express purpose" of such storage to mean *substantially likely* to be used for more than 20 years. Thus, plaintiffs oppose defendants' motion for summary judgment on the ground that material facts remain in dispute as to: (1) whether ERDA has now the technical capability to remove all high-level liquid wastes from so-called double shell tanks, and (2) whether ERDA can or will remove all high-

level liquid wastes from so-called double shell tanks within 20 years.

■ Upon consideration of section 202(4), its legislative history, and the arguments of the respective parties, the Court concludes that no material facts are in dispute and that defendants are entitled to judgment as a matter of law. As a preliminary matter, the Court rejects plaintiffs' argument that "long-term" storage means *any* storage for more than 20 years. Plaintiffs premise their construction of this term on the following language from the Senate committee report:

> [Sections 202(3) & (4)] provide [NRC] the authority and responsibility for licensing and related regulation of retrievable surface storage facilities and other facilities for high-level radioactive wastes which are or may be authorized by the Congress to be built by ERDA or with ERDA financial assistance for long term (*tens to hundreds of years*) storage of such radioactive wastes generated by the Administration or to which present high-level radioactive wastes may be transferred by the Administration in the future.

S.Rep. No. 93–980, 93d Cong., 2d Sess. 59 (1974) (emphasis added), U.S.Code Cong. & Admin.News 1974, pp. 5470, 5521. Plaintiffs interpret the word "tens" to manifest Congress' intent that 20 years be considered the outer limit of non-"long-term" storage. While the Court agrees that the aforequoted language indicates that "long-term" storage *may* be as short as 20 years, it does not suggest that any storage which in fact lasts 20 + years *must* be licensed by NRC.[5] As the NRC, in its decision of March 31, 1977, noted, "had Congress intended a precise number of years to be determinative, it hardly could have chosen a more imprecise means of saying so." Exhibit E, at 6 n.4. Accordingly, the Court concludes that the precise duration of storage was *not* intended to be determinative of NRC's licensing authority.

---

**5.** Plaintiffs also argue in support of their "20-year" argument that the "retrievable surface storage facilities" planned by ERDA, and which section 202(4) expressly describes as a "long-term" storage facility, are planned to store

high-level wastes from 20 to 100–plus years. The Court does not find this argument compelling in light of the other manifestations of congressional intent that are delineated below.

It thus becomes necessary to consider the meaning of the statutory phrase "authorized for the express purpose." Plaintiffs contend that in order to determine the "purpose" of any storage facilities, it is necessary to make "a factual determination of projected long-term use." Plaintiffs' Memorandum of May 26, 1977, at 19. This construction of section 202(4), however, fails to take into account the plain meaning of the words "authorized" and "express," and thus contravenes the well-accepted maxim of statutory construction

> that all words and provisions of statutes are intended to have meaning and are to be given effect, and words of a statute are not to be construed as surplusage.

*Wilderness Society v. Morton,* 156 U.S.App. D.C. 121, 135, 479 F.2d 842, 856, *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); 2A *Sutherland's Statutory Construction,* § 46.06 (Sands ed. 1973). At the very least, the phrase "authorized for the express purpose" of long-term storage requires that ERDA in fact *intend* to use the waste storage facilities in issue for such "long-term storage." [6] It is *not* sufficient, notwithstanding plaintiffs' contentions, merely for there to be the possibility (or even the likelihood) that ERDA *may* have to use the tanks in question for a few years in excess of 20 because of its technical capabilities.

This construction of section 202(4) is buttressed by its legislative history. This history indicates clearly that Congress was *only* concerned that NRC assume jurisdiction over waste storage facilities that are or become part of ERDA's future plan for an ultimate long-term storage program. As the Conference Report on the 1974 Energy Act explained,

> facilities for long-term storage of high-level radioactive waste . . . *are not now in existence* but will be developed in the near future for long-term, possibly permanent, storage of high-level radioactive wastes, including wastes from the licensed sector.

H.R.Rep. No. 93–1445, 93d Cong., 2d Sess. 34 (1974) (emphasis added), U.S.Code Cong. & Admin.News, p. 5547.

Congress' intent to limit NRC's licensing jurisdiction to waste storage facilities of the type that ERDA decides to utilize in its ultimate plan for long-term storage is further demonstrated by Congress' express purpose in giving NRC such licensing authority. In explaining the language which was ultimately enacted into law, the Senate Committee on Government Operations stated that the *purpose* of NRC's "enhanced" authority (over ERDA) was "to enabl[e] it to develop early expertise in new generations of nuclear technology as they approach commercial application." S.Rep. No. 93–980, 93d Cong., 2d Sess. 59 (1974), U.S.Code Cong. & Admin. News 1974, p. 5520. The Committee further explained that it believed such NRC licensing would ensure that NRC would "have the capability to develop [early] expertise . . . [and thereby] speed up the eventual licensing of new commercial reactors and other commercial nuclear facilities." *Id. See id.* at 21, U.S.Code Cong. & Admin.News 1974, p. 5520. This aspect of the legislative history evidences that, contrary to plaintiffs' position, Congress was

---

**6.** Defendants have argued that *only congressional* authorization in an appropriations or authorization statute would suffice to trigger section 202(4)'s coverage. Plaintiffs insist that this interpretation cannot be correct since it contradicts defendants' own position that ERDA should advise NRC if the tanks here in issue *later* "become part of ERDA's plans for long-term waste management." Defendants' Memorandum of May 16, 1977, at 34 n.*. In view of the Court's conclusion herein that even ERDA has not made the requisite determination to use the Hanford and Savannah River tanks for long-term storage, it is unnecessary

to rule on whether congressional authorization is a prerequisite to section 202(4) licensing. Nevertheless, the Court notes that the conference committee, in appropriating 1976 funds for 6 Hanford and 4 Savannah River tanks, concluded, based on ERDA's representations, that "these facilities for short-term storage of radioactive waste are not required to be licensed by the Nuclear Regulatory Commission." S.Rep. No. 94–514, at 75. The conference committee emphasized, however, that it "expects the Administration to make timely plans for the permanent storage of the wastes that will be contained in these tanks." *Id.*

*not* specifically concerned with the present safety of all new ERDA waste storage facilities when it enacted section 202(4). As the above-quoted language demonstrates, Congress was concerned with giving NRC the opportunity to develop regulatory expertise to ensure the *ultimate* safety of long-term nuclear waste storage facilities as such facilities achieve commercial acceptability. With respect to the safety of ERDA's current and other non-"long-term" storage facilities, it appears that Congress was content to rely on ERDA's own responsibility "to protect health and to .minimize danger to life or property." 42 U.S.C. § 2201(b).[7]

■ For the aforestated reasons, the Court concludes that section 202(4) was only intended to apply to waste storage facilities that are in fact intended by ERDA to become part of its ultimate management program for the long-term storage of high-level radioactive wastes. Accordingly, since ERDA's present intent is to select such an ultimate long-term storage program *at a future time,* after further research and development, the Hanford and Savannah River tanks here in issue cannot be said to have been "authorized for the express purpose" of long-term storage.[8] Thus, ERDA's decision not to seek licenses from NRC for these new tanks was fully in accordance with law.[9] The facts that plaintiffs allege to be in dispute are immaterial and irrele-

vant in view of this Court's construction of section 202(4), and defendants are therefore entitled to summary judgment on Count I.

   (3) *NRC's Reliance on ERDA's Representation That it Does Not at the Present Time Intend for the Waste-Storage Tanks in Issue to be Used for the Long-Term Storage of High-Level Radioactive Wastes is Fully Consistent with Section 202(4) and is not Arbitrary or Capricious.*

■ Although plaintiffs' legal claim in Count III against NRC differs from that invoked in Count I against ERDA, the legal issue decided by the Court with respect to Count I is also dispositive of Count III and compels the Court to grant defendants' motion for summary judgment on Count III. The entire basis of plaintiffs' challenge to NRC's decisionmaking in the instant case is that NRC relied upon ERDA's statement of intent with respect to the 22 storage tanks here in issue instead of undertaking an independent fact-finding inquiry. Plaintiffs' argument can be summarized as follows:

NRC had no information before it concerning ERDA's plans for long-term disposal. In the absence of such information, it is impossible for NRC to have made a valid determination that the waste would in fact remain in the tanks for less .than twenty years. For as long

---

**7.** *See* S.Rep. No. 93–980, at 62, U.S.Code Cong. & Admin.News, p. 5523 (other than the specific extensions of NRC authority provided for in § 202, "[t]he safe operation of noncommercial facilities, which are owned and operated by ERDA, will be *strictly the responsibility of ERDA.*"); *id.* at 29–30, U.S.Code Cong. & Admin.News, p. 5492 (responsibility of ERDA administrators "to assure that their programs are environmentally sound and will not impact adversely on public health and safety."). *See also* S.Rep. No. 94–515, at 75 (ERDA's responsibility "to assure that all storage of radioactive waste must be completely acceptable from the standpoint of the public health and safety and the protection of the environment.").

**8.** Plaintiffs have attempted to make much of the fact that *one* of the alternative storage methods presently being given serious consideration by ERDA for its ultimate nuclear-waste

management program is retention of wastes in double-shell tanks, including the 22 tanks here in issue. *See Alternatives for Long-Term Management of Defense High-Level Radioactive Waste, Hanford Reservation,* at 4–1 to 4–27 (ERDA 1977); *Alternatives for Long-Term Management of Defense High-Level Radioactive Waste, Savannah River Plant,* at III–1 to III–33 (ERDA 1977). However, until ERDA actually selects this alternative as part of its ultimate program for long-term waste management, it cannot be said that these facilities have been "authorized for the express purpose" of long-term storage.

**9.** It should be emphasized that ERDA fully recognizes its duty to seek licenses under section 202(4) once an ultimate management program for long-term storage is selected. *See* S.Rep. No. 94–514, at 76, *quoted supra.*

as there are no plans for long-term disposal—which is in fact the case at the present time—plainly the wastes will have to remain in the tanks.

Plaintiffs' Memorandum of April 25, 1977, at 35.

Plaintiffs' argument against NRC is premised in its entirety on their interpretation of section 202(4), which they construe to require the licensing of all nuclear waste storage facilities that are substantially likely to be used for more than 20 years. However, for the reasons already stated, the Court concludes that plaintiffs' interpretation of the Act is erroneous. In view of the Court's conclusion above, that section 202(4) was intended to apply only to facilities that are in fact intended by ERDA to become part of its ultimate management program for the long-term storage of high-level radioactive wastes, *see* pp. 1252–1254, *supra*, plaintiffs' arguments with respect to NRC's reliance on ERDA's representations (without independent fact-finding) are without merit.[10]

NRC has expressly sought and obtained from ERDA an assurance that "ERDA will promptly inform NRC of any material changes in plans for the duration of storage of wastes at these facilities . . . [and will] supply NRC with a detailed report of the history of use of these facilities and plans for their future use approximately 10 years following completion of construction."[11] This assurance will enable NRC to assume licensing jurisdiction over the tanks here in issue if and when they become part of ERDA's ultimate management plan. Moreover, if for any reason ERDA's timetable for selecting such an ultimate plan for long-term storage is unduly and/or substantially delayed, NRC will be in a position, at the time such delay becomes evident, to consider whether the underlying purpose of section 202(4) is best effectuated by extend-

ing NRC licensing jurisdiction to the tanks herein involved. In view of these assurances from ERDA, this Court's construction of section 202(4), and the purpose of NRC's licensing authority as evidenced by the legislative history, it *cannot* be gainsaid that NRC's decisions not to assume licensing jurisdiction at this time were reasonable and fully in accordance with the law. Accordingly, the Court will grant defendants' motion for summary judgment on Count III.

## B. *Count II: The NEPA Issues*

Both parties have filed cross-motions for summary judgment on Count II. In this count, plaintiffs challenge as violative of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), ERDA's decision not to prepare any site-specific environmental impact statements for the FY 1976 and FY 1977 construction projects at both Hanford and Savannah River. As indicated in section II, *supra,* ERDA articulated the basis for these decisions in four "negative declarations." With respect to the FY 1976 construction project at Hanford, ERDA concluded that NEPA did not require the preparation of a site-specific EIS because

> the adverse environmental impact of the proposed facilities has been analyzed and determined to be insignificant and [because] the controversial aspects of radioactive waste storage at Hanford is being addressed in a separate environmental statement . . . . .

Exh. 90. *See* 40 Fed.Reg. 22,165–66 (May 21, 1975). Similarly, ERDA decided not to prepare a site-specific EIS for the FY 1976 tanks at Savannah River because these tanks too would have an "insignificant" environmental impact and because a separate environmental statement then being prepared would address all "controversial aspects of radioactive waste storage." Exh.

---

**10.** Indeed, it is significant that the above-quoted summary of plaintiffs' argument *admits* that ERDA presently has no plans for "long-term" storage. Plaintiffs also admit this critical fact in their statement of material facts not in dispute (¶ 27). Under the Court's construction of section 202(4), the absence of any such long-

term plans by ERDA is dispositive of plaintiffs' claim against NRC.

**11.** Letter from James A. Wilderotter, General Counsel, ERDA, to Howard Shapar, Executive Legal Director, NRC (Jan. 17, 1977), NRC Admin. Record, at 364.

89. *See* 40 Fed.Reg. 22,166 (May 21, 1975). With respect to the FY 1977 construction projects at both Hanford and Savannah River, ERDA again concluded that no site-specific EIS's were necessary because the environmental impacts of these projects had been or were being analyzed in separate programmatic statements (one for Hanford, one for Savannah River) on their ongoing waste management practices. *See* 41 Fed.Reg. 38,209 (Sept. 9, 1976); 41 Fed. Reg. 48,398 (Nov. 3, 1976). ERDA did *not* assert that these FY 1977 projects would not "significantly [affect] the quality of the human environment." 42 U.S.C. § 4332(2)(C), and ERDA now apparently has abandoned its contention that all the construction projects here in issue would have *no significant environmental impacts.*[12]

Plaintiffs contend that defendants may not, consistent with NEPA, rely on the Hanford and Savannah River programmatic environmental impact statements (PEIS).[13] They assert that the environmental analysis contained in these PEIS's is insufficient as a matter of law with respect to the particular construction projects because both program statements fail (1) to analyze design alternatives and alternative safety features for the new tanks, and (2) to evaluate the long-term planning and decisionmaking consequences of the present construction of the storage tanks in issue. Because of ERDA's reliance on the environmental analysis in the Hanford and Savannah River PEIS's, it is necessary, as a preliminary matter, to set forth (1) the background and scope of these PEIS's, and (2) the general standards governing the interrelationship

of PEIS's and site-specific impact statements. The Court will then consider plaintiffs' specific challenges to the adequacy of defendants' environmental analysis.

.(1) *The Hanford and Savannah River Programmatic Impact Statements*

Prior to August 1973, the Atomic Energy Commission (AEC), ERDA's predecessor agency, had no final EIS on its ongoing waste management program at Hanford and was not in the process of preparing such an EIS. On August 1, 1973, some of the plaintiffs in the present suit, along with other organizations and one individual, brought suit against the AEC in the Eastern District of Washington, *NRDC, et al., v. Dixy Lee Ray, et al.,* Civil Action No. 3924. The complaint therein asserted two counts: Count I sought to require the AEC to prepare a programmatic EIS with respect to the storage and disposal of radioactive wastes at Hanford. Count II sought to enjoin the release of radioactive effluents into the soil, which allegedly violated certain provisions of the Atomic Energy Act.[14] Shortly after the suit was filed, the Court entered a consent order with respect to Count I. This order, entered on August 17, 1973, provided in pertinent part:

> Defendants will prepare with diligence and with all reasonable speed a detailed environmental impact statement on the storage and disposal of radioactive wastes generated and accumulated at the AEC Hanford Reservation near Richland, Washington (Hanford), pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4335.

**12.** Defendants have not argued in their papers before the Court that the FY 1976 and 1977 construction projects will have no significant effect on environmental quality. Nor does it appear that any such argument could be tenable in view of (1) the undeniable environmental significance of secure storage of high-level radioactive wastes, and (2) the AEC's preparation of site-specific impact statements on previous tank construction projects at Savannah River. *See* Letter from NRDC to Mr. Robert Fri, Deputy Administrator, ERDA, at 3 n.5 (Aug. 7, 1975), NRC Admin. Record 3, 5.

**13.** Exh. 39 (Final EIS, Waste Management Operations—Hanford Reservation (Dec. 1975)); Exh. 95 (Final EIS, Waste Management Operations—Savannah River Plant (Sept. 1977)). The Savannah River PEIS was only in draft form at the time the FY 1977 negative declarations were made by ERDA. *See* Exh. 48 (Draft EIS).

**14.** Count II of the Eastern District of Washington suit was subsequently dismissed by the Court on March 21, 1977, pursuant to plaintiffs' Fed.R.Civ.P. 41(a)(2) motion.

Pursuant to the consent order, the AEC, and then ERDA, undertook the preparation of a programmatic impact statement on the storage and disposal operations at Hanford. The final PEIS was completed in December 1975. The scope of this PEIS is described in its Foreword as follows:

The purpose of this statement is to reassess the environmental impact associated with continuation of the Hanford Waste Management Operations Program to provide an informational record for use in future planning and decision making in order to assure that further waste management practices will be conducted so as to minimize adverse environmental consequences. The statement will serve as a base for evaluating the environmental impact of future actions in relation to the existing environment at Hanford.

Subsequent to the completion of the Hanford PEIS, plaintiffs moved to have the defendants held in contempt for failure to comply with the Court's order of August 17, 1973. Specifically, plaintiffs alleged the defendants wilfully omitted from the final PEIS "any detailed consideration of disposal of radioactive wastes generated and accumulated at Hanford." Exh. 1–B to Affidavit of Richard Cotton, at 2. The District Court for the Eastern District of Washington denied plaintiffs' contempt motion on March 21, 1977. It held:

The defendants are found to have prepared a final environmental statement which reassessed and reevaluated the current waste management program at Hanford, including current storage and disposal practices. That final environmental statement provided the federal defendants with an environmental disclosure sufficiently detailed to aid in the decision as to whether and how to proceed with the current Hanford radioactive waste management program, and, made available to the public information concerning the environmental impacts of the current program and encouraged public participation in the development of that information. The defendants' final environmental statement is not an environmental statement on the ultimate disposal of Hanford radioactive wastes. The fact that the defendants have stated they intend in the future to submit a proposal for ultimate disposal does not empower this Court to now require the preparation of an environmental statement on ultimate disposal.

The defendants' final environmental statement (ERDA–1538, December, 1975), complies with the requirements of the National Environmental Policy Act of 1969, as required by the order of this Court dated August 17, 1973.

Exh. 78, at 3–4.

The Savannah River PEIS was prepared by ERDA without the impetus of litigation. The draft EIS was completed in October 1976 (Exh. 48), and the final PEIS was completed in September 1977. (Exh. 95, ERDA–1537). The scope of this PEIS, as described in its Foreword, is as follows:

This environmental statement was prepared to provide a detailed analysis of the actual and potential environmental effects associated with waste management operations at the Savannah River Plant.

.  .  .

The Federal action under review is the interim management of SRP wastes in accordance with ERDA policies and standards that require continued efforts to reduce releases to values that are as far as practical below guidelines which minimize risk to the population, and to develop improved methods of waste storage. Thus, the descriptive material in this statement presents detailed background information that may be used as a basis for environmental assessments or statements on long-range plans as they develop.  .  .  .

The scope of this environmental statement is limited to effluent control and interim defense waste management operations at SRP. In this respect, it is similar to the waste management operations environmental statements for [Hanford and the Idaho National Engineering Laboratory].

The adequacy of this PEIS has not been challenged to date.

### (2) The Interrelationship of Programmatic Impact Statements and Site-Specific Impact Statements

Most NEPA litigation to date has focused on the impact statement requirement of section 102(2)(C) as applied to particular, and usually localized, individual actions. *See* Note, *Program Environmental Impact Statements: Review and Remedies,* 75 Mich.L.Rev. 107, at 107–08 (1976); Anderson, *The National Environmental Policy Act,* in Environmental Law Institute, *Federal Environmental Law* 238, 338–39 (E. Dolgin & T. Guilbert eds. 1974). In many situations, however, a series of interrelated actions may have cumulative impacts that cannot adequately be analyzed in a series of individual impact statements. As the Supreme Court recognized in *Kleppe v. Sierra Club,* 427 U.S. 390, 409–10, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976):

A comprehensive impact statement may be necessary for an agency to meet [its duty under § 102(2)(C).] Thus, when several proposals for [related] actions that have a cumulative or synergistic environmental impact upon a region are concurrently pending before an agency, their environmental consequences *must* be considered together.

[Footnote omitted; emphasis added.] *See NRDC v. Hodel,* 435 F.Supp. 590, 598–602 (D.Or.1977).

■ Such "programmatic" impact statements are particularly appropriate when, as with ERDA's waste management practices, the agency has an ongoing program that continues to have a significant effect on the human environment. *Cf. Lee v. Resor,* 348 F.Supp. 389 (M.D.Fla.1972) (EIS required for Corps of Engineers' continuing program for spraying herbicides on St. Johns River). As the Council on Environmental Quality's (CEQ) NEPA regulations expressly direct:

Agencies should give careful attention to identifying and defining the purpose and scope of the action which would most appropriately serve as the subject of the statement. In many cases, broad program statements will be required in order to assess the environmental effects of a number of actions on a geographical area (e. g., coal leases), or environmental impacts that are generic or common to a series of agency actions (e. g., maintenance or waste handling practices), or the overall impact of a large-scale program or chain of contemplated projects (e. g., major lengths of highway as opposed to small segments).

40 C.F.R. § 1500.7(d)(1) (1977). Thus, the District Court for the Eastern District of Washington was clearly correct in directing the AEC to prepare a PEIS for the ongoing waste management operations at Hanford, and ERDA's decision to prepare a parallel PEIS for Savannah River was fully consistent with both the letter and spirit of NEPA.

■ As a general rule, the preparation of a PEIS does not obviate the necessity of preparing a particularized impact statement for individual major federal actions that are components of a subject program. Because programmatic statements are primarily concerned with analyzing the cumulative or synergistic environmental impacts of a program as a whole, they generally are unable to reflect a considered analysis of the particularized aspects of individual federal actions. Yet such analysis of particularized aspects of individual federal actions *must* be performed under the mandate of section 102(2)(C). Thus, "site-specific" EIS's [15] will usually be necessary to supplement the environmental analysis of a programmatic impact statement. *See generally NRDC v. United States Nuclear Regulatory Commis-*

---

15. Defendants' Memorandum of May 16, 1977, attempts to obscure the true nature of the Hanford and Savannah River *programmatic* impact statements by characterizing them as *site-specific* statements. While both statements focus on a particular geographic locale, the intent of both statements is to evaluate generally an entire program rather than an individual major federal action. Perhaps the most appropriate dichotomy in the instant case would therefore be *programmatic/project-specific.* Nevertheless, because the term "site-specific" has become a term of art in environmental litigation, the Court will use the term to include all individual project EIS's.

*sion,* 539 F.2d 824, 841 (2d Cir. 1976), *cert. granted,* 430 U.S. 944, 97 S.Ct. 1578, 51 L.Ed.2d 791 (1977).

CEQ has recognized the necessity of such "tiering" of impact statements in the very regulation that addresses the general need for programmatic statements:

> Subsequent statements on major individual actions will be necessary where such actions have significant environmental impacts not adequately evaluated in the program statement.

40 C.F.R. § 1500.6(d)(1) (1977). *See* CEQ, Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements (May 16, 1972), *reprinted in* 3 BNA Environment Rep. 82, 87; W. Rogers, *Environmental Law,* § 7.9, at 787 (1977). ERDA, too, has recognized the necessity of following programmatic statements with site-specific statements. Indeed, ERDA has adopted the position that such follow-up site-specific statements will be the rule, rather than the exception:

> In general, an analysis of specific impacts and alternatives dependent upon design, site, or other specific details of component projects or actions should be treated in environmental impact assessments or statements for specific projects or actions.

10 C.F.R. § 711.43(a)(1), 42 Fed.Reg. 4829 (Jan. 26, 1977).[16] Moreover, the very PEIS's herein involved anticipate the preparation of supplemental site-specific impact statements. Hanford PEIS, at ii; Savannah River PEIS, at iii-iv.

While a follow-up site-specific EIS will generally be required for individual "major Federal actions significantly af-fecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), such an EIS is not necessary if *all* the environmental analysis required by section 102(2)(C) of NEPA is contained in the programmatic statement.[17] *Cf. Scientists' Institute for Public Information, Inc. v. AEC,* 156 U.S. App.D.C. 395, 408, 481 F.2d 1079, 1092 (1974) (decision whether to include requisite environmental analysis in program statement or site-specific statement is within agency's discretion); *NRDC v. Callaway,* 524 F.2d 79, 91–92 (2d Cir. 1975) (supplemental impact statement may cure deficiency of initial statement); Note, *supra,* 75 Mich.L.Rev. at 120 ("no need to reconsider basic questions in every site-specific statement"). At least one court has held that a site-specific EIS was not required for a federal action in view of the adequacy of the programmatic impact statement. *See NRDC v. TVA,* 367 F.Supp. 128 (E.D.Tenn. 1973), *aff'd,* 502 F.2d 852 (6th Cir. 1974). However, a number of courts have rejected agencies' decisions not to prepare site-specific statements when the programmatic impact statement failed to give adequate consideration to project-specific factors. *See, e. g., NRDC v. Morton,* 388 F.Supp. 829, 836–41 (D.D.C.1974), *aff'd,* 174 U.S. App.D.C. 77, 527 F.2d 1386, *cert. denied,* 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *Kelley v. Butz,* 404 F.Supp. 925, 938–40 (W.D.Mich.1975). Accordingly, in order to determine whether ERDA's decision in the instant case *not* to prepare site-specific EIS's on the FY 1976 and FY 1977 storage tanks is consistent with NEPA, it is necessary to consider the adequacy of the environmental analysis in the two final

16. Two recent examples of this "tiering" of impact statements are *State of Alaska v. Andrus,* 580 F.2d 465 (D.C.Cir. 1978), and *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Both of these cases challenged the adequacy of site-specific impact statements for offshore oil and gas leases. In both cases, the challenged EIS's followed programmatic impact statements. In fact, the PEIS which preceded the *State of Alaska* site-specific EIS had previously been challenged and upheld. *See*

*California ex rel. Younger v. Morton,* 404 F.Supp. 26 (C.D.Cal.1975), *appeal pending,* No. 76–1431 (9th Cir.).

17. Thus, both CEQ's and ERDA's NEPA regulations expressly permit an agency to rely upon an analysis of alternatives in an existing impact statement, but *only* if "such treatment is current and relevant to the precise objective of the proposed action." 40 C.F.R. § 1500.8(a)(4) (1977); 10 C.F.R. § 711.83(d)(9), 42 Fed.Reg. 4833 (Jan. 26, 1977).

PEIS's *as applied to the individual construction projects.*[18]

(3) *Plaintiffs' Challenges to the Adequacy of the Hanford and Savannah River PEIS's as Applied to the FY 1976 and 1977 Construction Projects.*

(a) *Design and Safety Feature Alternatives.*

Plaintiffs' first challenge to the adequacy of the Hanford and Savannah River PEIS's as they apply to the FY 1976 and 1977 construction projects is that they contain no analysis of alternative design or safety features that might reduce the risk of leakage during storage or the risk of release during any retrieval, packaging, and shipment from the tanks to an ultimate disposal site. Specifically, plaintiffs have pointed to several modifications that could possibly be made in the construction of the FY 1976 and 1977 double-shell, stress-relieved carbon steel tanks at Hanford and Savannah River. At least three of these possible modifications were recommended by ARHCO, ERDA's principal contractor for waste management operations at Hanford, in a 1976 report entitled "Technical Record of the 241-SY-103 Primary Tank Bottom Flatness Studies."

Defendants do not contend that the Hanford and Savannah River PEIS's in fact contain analyses of either plaintiffs' suggested modifications or any other particular modifications in design or safety features. While they do assert that the three aforementioned contractor's recommendations, which were made *after* the final Hanford PEIS was issued, were "taken into account with respect to the design of the FY 1976-77 double-shell tanks,"[19] Defendants' Memorandum of May 16, 1977, at 14, defendants' primary arguments are that: (1) NEPA does not require that an impact statement analyze possible design and safety feature modifications such as those suggested by ARHCO and by plaintiffs; and (2) plaintiffs have not made a sufficient showing that any such modifications can reasonably be anticipated to result in any significant difference in environmental impact. The Court rejects both of these arguments.

Defendants premise their first argument—that NEPA does not require an EIS analysis of design and/or safety feature modifications—on NEPA's "rule of reason." In particular, defendants point to the Ninth Circuit's application of this "rule of reason" in *Brooks v. Coleman,* 518 F.2d 17 (1975). In *Brooks,* the Ninth Circuit held, on the particular facts of that case, that the EIS there in issue was not rendered inadequate by its failure to discuss a particular variant of certain design alternatives that had themselves been adequately discussed. De-

---

**18.** The interrelationship between programmatic and site-specific (or, here, project-specific) impact statements, as delineated in the text, renders untenable two of defendants' "threshold" arguments. First, defendants argue that the order and judgment by the District Court for the Eastern District of Washington in the Hanford PEIS litigation, *see* p. 1257 *supra,* is a bar, on the basis of *res judicata,* to any of plaintiffs' challenges herein to the adequacy of the Hanford PEIS. In that case, however, plaintiffs challenged the adequacy of the programmatic EIS as it applied to the ongoing *program.* Here, plaintiffs challenge the adequacy of that PEIS as it applies to particular new construction projects. Certainly, these are two discrete causes of action. Moreover, defendants' argument totally misconstrues the different functions of programmatic statements and site-specific statements. Accordingly, the Court emphatically rejects defendants' *res judicata* argument. Defendants' second "threshold argument" is that this Court should consider the

fact that plaintiffs failed to raise their instant challenges in comments to either the Hanford or Savannah River draft PEIS as evidence of the insignificance of their present challenge. This argument too misconceives the different functions of programmatic and site-specific impact statements. Moreover, in view of the fact that both the Hanford and Savannah River PEIS's expressly anticipated the preparation of subsequent site-specific EIS's, plaintiffs were fully justified in not treating these PEIS's as site-specific EIS's. Accordingly, the Court considers it entirely irrelevant that plaintiffs did not raise their site-specific challenges in comments to the draft PEIS's.

**19.** The implication of this representation by defendants—that no EIS is necessary as long as the agency has in fact considered possible alternatives—flouts the very role of impact statements under NEPA and must be rejected out-of-hand.

fendants contend that *Brooks* should guide this Court because here, as there, it was not unreasonable for the agency to omit discussing relatively insignificant variations.

Defendants are clearly correct in asserting that NEPA, and its "rule of reason," does not require an analysis of *every* conceivable project variation. Just last month, the Supreme Court addressed this general issue in *Vermont Yankee Nuclear Power Corp. v. NRDC,* —— U.S. ——, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).[20] The Court there emphasized that "[t]o make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility." —— U.S. at ——, 98 S.Ct. at 1215. The Court further stated:

> Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Id.* Applying these principles, the *Vermont Yankee* Court reversed the decision by the Court of Appeals that the AEC had improperly refused to consider in its site-specific EIS "energy conservation" alternatives to two proposed nuclear reactors. In so holding, the Supreme Court pointed to several factors upon which it based its conclusion that it was not unreasonable for the Commission to refuse to inquire further into "energy conservation" alternatives: (1) the term "energy conservation" encompasses "a virtually limitless range of possible actions and developments that might, in one way or another, ultimately reduce projected demands for electricity . . ., —— U.S. at ——, 98 S.Ct. at 1216; (2) to compel the agency to consider further "energy conservation" alternatives would force the agency "to embark upon an exploration of uncharted territory," *id.*; and (3) a considerable proportion of the "energy conservation" alternatives that the Court of Appeals sought to compel the Commission to consider had only been recognized *after* the final EIS had been prepared. *Id.*

While the *Vermont Yankee* decision reversed the Court of Appeals' particular *application* of NEPA's "rule of reason" in *Aeschliman v. United States Nuclear Regulatory Commission,* 178 U.S.App.D.C. 325, 547 F.2d 622 (1976), the Supreme Court's decision in no way undermines, and in fact affirms, the appropriateness of the "rule of reason" as the basis for assessing agency compliance with section 102(2)(C) of NEPA.[21] Certainly nothing in *Vermont*

---

**20.** Two decisions by the Court of Appeals for the District of Columbia Circuit were consolidated by the Supreme Court for the purposes of review under the name of *Vermont Yankee Nuclear Power Corp. v. NRDC: NRDC v. United States Nuclear Regulatory Commission,* 178 U.S.App.D.C. 336, 547 F.2d 633 (1976); *Aeschliman v. United States Nuclear Regulatory Commission,* 178 U.S.App.D.C. 325, 547 F.2d 622 (1976). The *NRDC* case involved a challenge to the grant of a license to the Vermont Yankee Nuclear Power Corp. and a challenge to an AEC-adopted licensing rule that pertained to consideration of the environmental hazards of fuel reprocessing and/or disposal. The Court of Appeals had, *inter alia,* held that the licensing rule in issue had been promulgated after procedurally inadequate proceedings. The Supreme Court's reversal of the D. C. Circuit's *NRDC* decision focused on this issue of procedural adequacy. *See* —— U.S. at ——, 98 S.Ct. 1197. This aspect of the *Vermont Yankee* decision is not pertinent to the NEPA issues

involved in the instant case. The *Aeschliman* case involved a challenge to the adequacy of an AEC-prepared EIS for two pressurized-water nuclear reactors. The D. C. Circuit held, *inter alia,* that the impact statement was defective because it failed to give adequate consideration to the alternative of "energy conservation." The Supreme Court reversed this decision also, and it is this part of the *Vermont Yankee* opinion that is germane to the NEPA issues involved herein. *See* —— U.S. at ——, 98 S.Ct. 1197.

**21.** The appropriateness of applying a "rule of reason" in reviewing impact statements for compliance with NEPA has been widely accepted by the courts of appeals. *See, e. g., Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 827 (D.C.Cir.1976); *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1378 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975).

*Yankee* suggests that the Supreme Court doubts that

> it is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that [has been] characterized as "the linchpin of the entire impact statement." *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693 at 697–98 (2 Cir.)

*NRDC v. Callaway,* 524 F.2d at 92. *See State of Alaska v. Andrus,* 580 F.2d at 474. Finally, nothing in *Vermont Yankee* calls into question the well-established rule that *all reasonable* alternatives must be considered even if such alternatives "do not offer a complete solution to the problem." *NRDC v. Morton,* 148 U.S.App.D.C. 5, 14, 458 F.2d 827, 836 (1972), *aff'g,* 337 F.Supp. 165 (D.D.C.1971); *NRDC v. Callaway,* 524 F.2d at 93. Accordingly, this Court concludes that *Vermont Yankee* provides no support for defendants' generalized assertion that NEPA does not require an EIS analysis of reasonable design and safety feature alternatives.

Defendants' construction of the "rule of reason" is incompatible with the well-established case law, referred to above, that interprets section 102(2)(C)'s "alternatives" requirement. Moreover, it is inconsistent with the governing ERDA and CEQ regulations. Both agencies' NEPA regulations strongly underscore the importance of an adequate analysis of reasonable alternatives, and both sets of regulations specifically require design alternatives to be the subject of "rigorous explanation and objective evaluation." 40 C.F.R. § 1500.8(a)(4) (1977); 10 C.F.R. § 711.83(d)(9), 42 Fed.Reg. 4833 (Jan. 26, 1977). CEQ's regulations require an analysis of "all reasonable alternative actions" including those that might "avoid some or all of the adverse environmental effects," and ERDA's regulations require an analysis of alternatives "that might be specifically formulated to enhance environmental quality or to avoid, mitigate, or compensate for some of the adverse environmental effects." One of the specific examples provided by both CEQ and ERDA is "alternatives related to different designs or details of the proposed action which would present different environmental impacts." The Court therefore rejects defendants' contention that ERDA is not required to assess in an EIS reasonable design and safety feature alternatives.

Defendants' second argument—that plaintiffs have not made a sufficient showing herein that there exist particular design or safety feature alternatives that *reasonably* can be anticipated to have a significantly different environmental impact—confronts the Court with a somewhat unusual problem. In most EIS cases in which the adequacy of the analysis of project alternatives is being challenged, defendants have prepared an impact statement, and that statement has been circulated and commented upon in its draft form. Thus, prior to the institution of litigation, most plaintiffs will have had a formal opportunity to call to the attention of the agency preparing the EIS additional alternatives to which consideration should be given. In the present case, no site-specific impact statements have been prepared for the FY 1976 and 1977 construction projects, and plaintiffs therefore have not had a formal opportunity to comment on a draft EIS. Nevertheless, plaintiff NRDC, by letter of August 7, 1975, *see* NRC Admin. Record, at 3, did protest ERDA's decision not to prepare site-specific EIS's for the FY 1976 projects; and in that letter, NRDC *specifically* called to ERDA's attention a number of *particular* design and safety feature alternatives. NRDC, unlike the intervenors in *Vermont Yankee,* thus "structure[d] [its] participation so that it [was] meaningful [and] so that it alert[ed] the agency to [its] positions and contentions." —— U.S. at ——, 98 S.Ct. at 1216. The Court will therefore treat the points raised by NRDC in its letter, which apply equally to ERDA's decision not to prepare site-specific EIS's for *both* the FY 1976 and FY 1977 projects, as functionally identical to comments prepared in response to a draft EIS.

■ Unlike the generalized alternative of "energy conservation" that was at issue in *Vermont Yankee,* the design and safety feature alternatives suggested by NRDC for the FY 1976 and 1977 storage tanks were both focused and feasible. Indeed, as noted above, at least three of the possible modifications were specifically recommended by ERDA's principal contractor at Hanford. *None* of the factors upon which the *Vermont Yankee* Court based its reversal of *Aeschliman* apply to the specific alternatives suggested by plaintiffs herein: The suggested design and safety feature alternatives for the FY 1976 and 1977 tanks do *not* encompass a "limitless range of possible actions," would *not* force ERDA "to embark upon an exploration of uncharted territory," and were *not* recognized substantially after ERDA's decision not to prepare site-specific EIS's for the tanks in issue.[22] The Court thus concludes that the plaintiffs herein, unlike the intervenors in *Vermont Yankee,* have called sufficient attention to apparently feasible alternatives to warrant reasoned consideration by ERDA.

Under *these* circumstances, this Court believes that the approach of the Court of Appeals for this Circuit in *Aeschliman* remains viable.[23] Thus, this Court holds that in the instant case

> it is incumbent on [ERDA] to undertake its own preliminary investigation of the proffered alternative sufficient to reach a rational judgment whether it is worthy of detailed consideration in the EIS. Moreover, the [Administration] must explain the basis for each conclusion that further consideration of a suggested alternative is unwarranted. An explicit statement is essential to enable the parties to challenge the agency's action through motions for reconsideration, and to facilitate judicial review. The preliminary investigation of an alternative to determine whether it merits further consideration need not be nearly as detailed as that required regarding alternatives which are considered in the EIS. Often a short explanation will suffice. It is not "onerous" for an agency, as well as a court, to state its reasons "if the matter was dealt with in a conscientious manner in passing on the merits." *See Davis v. Clark,* 131 U.S.App.D.C. 379, 404 F.2d 1356, 1358 (1968) (separate opinion of Tamm, J.).

*Aeschliman v. U. S. Nuclear Regulatory Commission,* 178 U.S.App.D.C. at 331, 547 F.2d at 628, *rev'd on other grounds,* —— U.S. ——, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (footnotes omitted). Absent such an explicit statement by the agency, this Court is unable to perform its judicial function which is to determine whether ERDA's decision not to prepare site-specific EIS's to discuss design and safety feature alternatives for the FY 1976 and 1977 projects was arbitrary and capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Since defendants have failed to articulate why plaintiffs' suggested alternatives should or should not be considered further, this Court must grant plaintiffs' motion for summary judgment on this portion of Count II and remand this aspect of plaintiffs' challenge to ERDA for further consideration and an adequate explanation as required by *Aeschliman.*

(b) *Effect of the Projects on ERDA's Future Planning and Decisionmaking With Respect to Long-Term Storage of Radioactive Wastes.*

Plaintiffs' second challenge to the adequacy of the Hanford and Savannah River

---

**22.** It appears that the *Vermont Yankee* Court was also influenced by the fact that the record before the agency therein gave "every indication that the project was actually needed, [and] there was nothing before the Board to indicate to the contrary." —— U.S. at ——, 98 S.Ct. at 1216. Again, the present case is distinguishable since there exists no record whatsoever with respect to the need for the particular design chosen or with respect to the effect(s) of adopting or incorporating any of the suggested alternatives.

**23.** The Supreme Court characterized the approach taken by the *Aeschliman* opinion as "not entirely unappealing," —— U.S. at ——, 98 S.Ct. 1197, but did not decide *Vermont Yankee* on this basis. Rather, the *Vermont Yankee* decision was premised solely on the *application* of the *Aeschliman* approach to the particular facts of that case.

PEIS's as applied to the construction projects here in issue focuses on ERDA's alleged failure to consider the long-term planning and decisionmaking implications of its decision(s) to build the 22 double-shell, stress-relieved carbon steel storage tanks here in issue. Plaintiffs contend that ERDA prior to authorizing the FY 1976 and 1977 projects, should have compared in a site-specific EIS the long-term planning and decisionmaking implications of constructing these particular tanks *with* the long-term planning and decisionmaking implications of constructing (1) double-shell, stress-relieved carbon steel tanks which incorporate various design and safety feature alternatives,[24] and (2) alternative tank types and/or storage techniques, such as the stainless steel tanks and calcinated acid-waste storage now being utilized by ERDA at INEL. By long-term planning and decisionmaking implications, plaintiffs mean the effect that the current choice of tank type, storage technique, and/or tank design may have *both* on the ultimate choice of a technology for long-term radioactive waste storage *and* on the timing of such choice. Defendants have not controverted plaintiffs' assertion that neither of the PEIS's considers the long-term planning and decisionmaking implications of the FY 1976 and 1977 construction projects. *See* Plaintiffs' Statement of Material Facts Not in Dispute (April 25, 1977), No. 21. Rather, defendants contend that it is sufficient for the purposes of NEPA for them to consider the effects of the FY 1976 and 1977 construction projects in subsequent impact statements that will accompany ERDA's future proposals for long-term storage of radioactive wastes.

■ There can be no doubt that, in order to comply with section 102(2)(C) of NEPA, a federal agency must, as a general

rule, assess "the extent to which the proposed action involves tradeoffs between short-term environmental gains at the expense of long-term losses, or vice versa," "the extent to which the proposed action forecloses future actions," and the extent to which the proposed action involves "irreversible and irretrievable commitments of resources." CEQ Guidelines, 40 C.F.R. §§ 1500.8(a)(6), (7) (1977). *See NRDC v. United States Nuclear Regulatory Commission,* 178 U.S.App.D.C. 336, 345, 547 F.2d 633, 642 (1976), *rev'd on other grounds sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC,* —— U.S. ——, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Indeed, ERDA has expressly adopted this standard in its NEPA regulations. 10 C.F.R. § 711.83(a)(8), 42 Fed.Reg. 4833 (Jan. 26, 1977). To comply with these requirements, an agency must, when faced with alternatives to a proposed course of action, compare the effects of such alternatives on long-term decisionmaking and planning.

The Court recognizes that the instant case is unique because, as all parties agree, ERDA was confronted with a situation at both Hanford and Savannah River that gave it *no reasonable alternative* to the construction of new storage tanks. Thus unlike in most NEPA cases, defendants herein did not have the alternatives of "no action," *see, e. g., Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693 (2d Cir. 1972), or of "delay," *see, e. g., State of Alaska v. Andrus, supra,* 580 F.2d at 472 477. Over the past two decades, at least 20 single-shell tanks at Hanford have developed leaks and released approximately 450,-000 gallons of high-level liquid radioactive wastes into the surrounding soil. Stipulation as to Undisputed Facts, ¶ 31 (Mar. 25, 1977). Another 24 single-shell tanks at

---

**24.** Of course, if there exist no *reasonable* design or safety feature alternatives, *see* section III(B)(3)(a), *supra,* then analysis of the long-term planning and decisionmaking implications of design and safety feature alternatives would presumably be unnecessary. However, the long-term planning and decisionmaking implications of certain such alternatives may well have a profound influence on the decision

whether a particular alternative is or is not "reasonable." Thus, while the Court, for analytical purposes, has segregated its consideration of design and safety feature alternatives from long-term planning and decisionmaking implications, ERDA, on remand, should be careful to give full consideration to the interrelation of these two matters.

Hanford have shown indications of potential leakage. Id. ¶ 36. In contrast, no leaks have occurred in the double-shell tanks at Hanford and Savannah River, which are similar to the FY 1976 and 1977 tanks here in issue. In the next several years, Hanford and Savannah River will respectively produce somewhere in the neighborhood of one million and three million gallons of new high-level radioactive waste annually.

In order to minimize the immediate environmental damage caused by the leakage of single-shell carbon steel tanks, and in view of ERDA's failure to develop an acceptable method of long-term storage for the Hanford and Savannah River wastes, ERDA had, it seems, no choice but to seek immediate authorization to construct some type of interim replacement tank. Recognizing this fact, several environmental organizations, including three of the plaintiffs herein, expressly urged defendants to take such an interim step:

> [We] believe ERDA must immediately undertake a construction program to replace single-wall tanks which are about to fail or which can be expected to fail in the future in order to assure that the existing wastes can be retrieved at a time when an ultimate plan is finally implemented.

Hanford PEIS, at X–203 (comments on draft EIS). Indeed, these environmental organizations themselves argued that ERDA's *failure* to construct replacement tanks before additional existing tanks leaked would foreclose "many options for the safe, responsible disposal of the wastes." *Id.*

Notwithstanding the necessity of ERDA's constructing new storage tanks to provide safe interim storage while ERDA continues its program to research and develop an ultimate high-level radioactive waste storage program, this is *not* a case where the agency had no choices before it. At the very least, as appears from ERDA's discussion of "alternatives" in both the Hanford PEIS (§ V) and the Savannah River PEIS (§ V), there exist at least a few reasonable alternatives to the storage technique that

will be used in the 22 new carbon steel tanks at Hanford and Savannah River. Moreover, it appears that the calcinated acid-waste storage in stainless steel tanks now being used by ERDA at INEL is a quite feasible alternative to the Hanford and Savannah River systems. In addition, as indicated in section III(B)(3)(a), *supra*, it appears that there may be a number of reasonable design or safety feature alternatives that could be incorporated in the present carbon steel tanks.

It further appears to the Court that, as plaintiffs contend, the choice of present tank type (*e. g., carbon steel vs. stainless steel*) may well affect the durability of the tanks. Similarly, it appears that the present storage technique (*e. g., calcine storage vs. alkaline liquids, salt cake, and sludge*) may affect both the durability of the tanks and the ease of waste retrieval from such tanks. Finally, it appears to the Court that at least some of the design and safety feature alternatives suggested by plaintiffs may affect the durability of the tanks or the ease of waste retrieval from such tanks. Certainly the retrievability of waste from the present tanks will have an important influence on the selection of an ultimate storage program, for if the wastes cannot safely be removed, it may be necessary to retain the wastes permanently in the present interim tanks. As plaintiffs assert, "[to] the extent that future retrievability is not maximized in the construction of these tanks, ERDA may be foreclosing the option of doing anything . . ." other than keeping the wastes where they are. Plaintiffs' Memorandum of April 21, 1978, at 2. Similarly, the durability of the present tanks will almost surely affect the choice of an ultimate storage system, for the useful life of the present 22 tanks will determine *when* ERDA must select a new storage system or build yet another set of interim tanks.

In view of the foregoing, there can be no doubt that ERDA's choice of tank type, storage technique, and design and safety features may have a profound effect on ERDA's future planning for long-term stor-

age of high-level radioactive wastes. Yet neither of ERDA's two programmatic EIS's contain a meaningful analysis and discussion of such long-term planning implications. Even though both the Hanford and Savannah River PEIS's contain a brief discussion of the calcinated acid-waste system, Hanford PEIS, at V–9; Savannah River PEIS, at V–10, neither discusses in any depth the relative durability and retrievability of this system as compared with the present system. And, since neither of the PEIS's discusses the various design and safety feature alternatives suggested by plaintiffs, see section III(B)(3)(a), supra, neither PEIS assesses the effects of such modifications on the durability of and retrievability from the present tanks. Accordingly, the Court must conclude that neither of ERDA's two waste-management PEIS's satisfies NEPA's section 102(2)(C) mandate with respect to long-term planning and decisionmaking implications of the present construction projects, and the Court further concludes that ERDA's decision not to prepare site-specific EIS's to discuss such long-term implications with respect to the 22 tanks now under construction was arbitrary and capricious.

The Court will therefore grant plaintiffs' motion for summary judgment on this second portion of Count II, and will require ERDA to prepare a site-specific impact statement to discuss fully the long-term planning and decisionmaking implications of ERDA's choice of tank type and storage technique for the present 22 tanks. With respect to design and safety feature alternatives to the present tank designs, the Court, in section III(B)(3)(a) of this opinion, concluded that ERDA itself must explicitly consider plaintiffs' suggestions of alternatives before the Court can perform its function of judicial review. Thus, until ERDA has completed its consideration of these alternatives, the Court cannot assess whether ERDA's decision not to discuss some or all of the suggested design and safety feature alternatives in a site-specific impact statement is sustainable. It is sufficient for present purposes to emphasize that if any of plaintiffs' suggested design and safety feature alternatives do in fact merit ERDA's consideration in an impact statement, then ERDA must consider in addition to all other appropriate factors the long-term planning and decisionmaking implications of the decision to include or to exclude each such alternative.

## IV. CONCLUSION

The Court will deny defendants' motion to dismiss Counts I and III (the licensing counts) for lack of jurisdiction, but the Court will grant defendants' motion for summary judgment on both of these counts. The Court will grant plaintiffs' motion for summary judgment with respect to that part of Count II (the NEPA Count) wherein plaintiffs have challenged ERDA's failure to prepare a site-specific impact statement to consider design and safety feature alternatives, and the Court will remand this aspect of Count II to ERDA. Finally, the Court will grant plaintiff's motion for summary judgment with respect to that part of Count II wherein plaintiffs challenge ERDA's failure to prepare a site-specific impact statement to discuss the long-term planning and decisionmaking implications of the construction projects here in issue, and the Court will order ERDA to prepare a site-specific EIS to discuss fully these implications.