**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

**v.**

**UNITED STATES FOREST SERVICE, et al., Defendants,**

**and**

**Davidson Industries, Inc., et al., Defendants-Intervenors.**

**Civ. No. 83–1153–SO.**

United States District Court, D. Oregon.

Aug. 6, 1984.

Terence L. Thatcher, National Wildlife Federation, Portland, Or., Gary D. Meyers, Lake Oswego, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Robert Simmons, Sp. Asst. U.S. Atty., Portland, Or., for defendants.

Phillip D. Chadsey, Richard D. Bach, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for defendants-intervenors.

## AMENDED OPINION [*]

SOLOMON, Senior District Judge:

National Wildlife Federation, Oregon Wildlife Federation, and Siuslaw Task Force (plaintiffs) filed this action to enjoin the United States Forest Service from conducting proposed timber sales in the Mapleton Ranger District of the Siuslaw National Forest. Joined in this action as defendant-intervenors are companies that purchase or log timber from the Mapleton District, road construction companies, and trade associations representing Oregon timber and logging interests.[1]

Plaintiffs contend that the timber sales proposed by the Forest Service in its Mapleton Ranger District Seven Year Action Plan will violate: (1) the National Forest Management Act of 1976, 16 U.S.C. § 1600 et seq.;[2] (2) the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528–531; (3) and the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4361.

### Facts

The Mapleton Ranger District is one of five ranger districts in the Siuslaw National Forest. The Mapleton District consists of approximately 200,000 acres in the center of Oregon's coast range. The streams in the Mapleton District provide spawning and rearing habitats for many species of anadromous fish, including coho salmon, chinook salmon, sea-run cutthroat trout,

[*] In this opinion, the following abbreviations are used:
 CEQ—Council on Environmental Quality
 EA—Environmental Assessment
 EIS—Environmental Impact Statement
 MUSY—Multiple Use Sustained Yield Act
 NEPA—National Environmental Policy Act
 NFMA—National Forest Management Act
 TR Plan—Timber Resources Plan

1. Defendant-intervenors include: Davidson Industries, Inc.; The Murphy Co.; North Side Lumber Co.; Bohemia Inc.; Mitchell & Sons Logging, Inc.; R.D. Harris Construction, Inc.; Lloyd S. Hockema, Inc.; Industrial Forestry Association; North West Timber Association; Associated Oregon Loggers, Inc.; Oregon Forest Industries Council; and Western Forest Industries Association.

2. The NMFA is codified at 16 U.S.C. §§ 472a, 500, 515–16, 518, 576b, 1600, 1602, 1604, 1606, and 1608–14.

and steelhead trout.[3] The district also provides habitats for many species of non-game fish, such as sculpins, dace, and squawfish.

Heavy rainfall and steep slopes make the Mapleton District particularly susceptible to soil erosion. It has the highest concentration of landslide-prone landtypes [4] in the Siuslaw National Forest. As early as 1963, Forest Service personnel noticed that timber harvesting damaged soil, watersheds, and fish habitats in the district. Throughout the 1960's, soil specialists warned that logging and road construction could seriously affect soil and watershed stability. In 1969, the Regional Forester placed a moratorium on timber harvesting in the part of the Mapleton District between the Smith and Umpqua Rivers. This moratorium was to remain in place until a study determined if logging was compatible with soil and water resource protection. The study was inconclusive because of poor design, personnel problems, and equipment breakdown. In 1980, the Forest Service lifted the moratorium.

Since 1965, Forest Service personnel repeatedly recommended a land suitability analysis to identify critical areas in the district. In 1974, a forest-wide study of land types was performed which identified some of these critical areas, but it did not classify any area as non-harvestable. In the 1970's some attempts were made to alleviate the impact of logging on the fragile Mapleton District slopes. Most changes were designed to avert the damage caused by road construction. The Forest Service also adopted some new harvesting techniques [5] and implemented stream buffer zones that leave trees standing along stream banks.

In 1975, a severe storm hit the Mapleton District. A Forest Service survey of 70 percent of the district showed 245 landslides. Of these slides, 9 percent were natural events, 14 percent were road related, and 77 percent were in clearcut units apparently unrelated to roads or landings. In this survey, clearcut slides scoured 8.98 miles of streams, road-related slides scoured 4.95 miles of streams, and natural slides scoured 3.35 miles of streams.

Later landslide surveys show similar results. In 1978, a Forest Service survey of ninety-nine slides shows that seventy-five were clearcut-related. These clearcut slides accounted for 60 percent of the landslide volume and more than three miles of scoured streams. A 1982 Forest Service aerial photo survey showed fifty road-related and seventy-nine clearcut-related landslides. These slides scoured 14.29 miles of streams.

Erosion and landslides are natural phenomena in the Mapleton District. But, road building and timber harvesting have dramatically increased the rate of landslide erosion. The present Forest Service management techniques have eliminated some, but not all, of the practices responsible for the increased landslide erosion.[6] Unless all such practices are eliminated, the accelerated landslide erosion will cause major long-term damage to soil, water, and fishery resources.

Because intact vegetation reduces the potential for soil failure, the Forest Service tries to leave fragile or landslide-prone ar-

---

3. The district has nearly 450 miles of stream habitat. Forest Service studies have found that salmon and cutthroat trout spawn in every major stream and nearly every tributary within the district.

4. There are fifteen different landtypes in the Siuslaw National Forest and seven on the Mapleton District. Each landtype is characterized by distinct geology, topography, and vegetation.

5. Yarding techniques were changed from highlead and tractor removal to skyline and helicopter removal of felled trees. The Forest Service also started using an interdisciplinary team to evaluate each proposed timber sale. The team is made up of several resource specialists including a soil scientist and fish biologist.

6. For example, the Forest Service changed road construction techniques from sidecast to endhaul removal of debris. This change has lessened the amount of landslide activity caused by new roads. Sidecast roads accounted for most of the road-related slides that occurred in 1979 and a substantial part of the district's 646 miles of roads are sidecast roads.

eas uncut. These uncut areas are known as vegetative leave areas. The Forest Service places these leave areas in the most landslide-prone areas. In particular, leave areas are situated in steep headwall[7] areas and along the banks of streams. It is uncertain whether leave areas, as used by the Forest Service in the Mapleton District, prevent landslides. There is insufficient statistical evidence to evaluate them. Only twelve headwall leave areas have been put in place in the Mapleton District. Of these, only five were successful, five were partially successful, and two were unsuccessful. These two experienced slides. The five partially successful areas were those where low to moderate risk headwalls were protected while adjacent unstable headwalls were left unprotected. The Forest Service has not perfected its prediction rate on either location or size of their leave areas.

The Forest Service employees who were surveyed[8] in 1979, using a technique called the Delphi Method, predicted that 52 percent of the vegetative leave areas will survive. In 1981, they predicted a 32 percent survival rate for 5-acre leave areas and a 23 percent survival rate for 2.5-acre leave areas. Leave areas in the Mapleton District average 3 acres.

The Forest Service also uses "some protection" leave areas. "Some protection" leave areas are those which have only uncut understory and brush vegetation. The effectiveness of these partial leave areas has not been documented.

The most severe effects of landslides occur when large volumes of sediment and debris enter a stream channel and create a debris torrent. This mixture of soil, organic debris, sediment, and rocks can scour a stream channel to bedrock, damage streambank vegetation, and undercut adjacent slopes. Debris torrents can also reduce

fish productivity by removing not only spawning gravel, but also rearing grounds, and organic debris.[9] Landslides reduce the water quality and can also cause debris jams which block the passage of migrating fish. Debris torrents in clearcuts travel almost twice as far as debris torrents in undisturbed watersheds.

Forest Service models designed to assess the impact of timber management indicate that management activities have reduced fish habitat quality and quantity by 43 percent. An earlier model used in the 1979 Timber Resource Plan EIS reveals the potential productivity of fish habitat has been reduced by 28 percent for the Siuslaw National Forest and 50 percent for the Mapleton District. The Forest Service can rehabilitate some damage, like log jams, but its rehabilitation efforts for more complex damage have been only partially successful.

The experts disagree on the effect of timber management in the Mapleton District for its anadromous fish populations. Nevertheless, there is ample evidence that Forest Service management activity has damaged fish habitats in the Mapleton District. There is also evidence of a correlation between fish population and fresh water fish habitat.

In February, 1979, the Forest Service adopted a Timber Resource Plan (TR Plan) for the Siuslaw National Forest. The TR Plan sets out timber harvest levels and Forest Service objectives for the entire Siuslaw National Forest for a ten-year period.

The Forest Service prepared and filed an environmental impact statement for the TR Plan. One of the plaintiffs, the Siuslaw Task Force, participated in an early draft

---

7. Headwalls are the steep upper-slope areas close to the top of a ridge.

8. The Delphi Method calls for Forest Service employees to answer five questions with the answers expressed as a percentage estimate of success. The percentages were then multiplied by each other to obtain an overall estimate. There are inherent deficiencies in this technique because the multiplication of a series of percentages produces a conservative overall percentage. Even when discounted by this flaw, the survey results are still useful.

9. Streams that have been previously scoured and are sediment poor can benefit from a debris torrent.

of the TR Plan. It did not appeal the adoption of the TR Plan by the Forest Service. The Environmental Impact Statement does not discuss alternative land allocations for the Siuslaw Forest but only different levels of timber harvests. The statement does not address the impact of timber harvesting specifically on the Mapleton District.[10]

The Timber Resources Plan indicates that a separate Mapleton District land use plan will be prepared. Of the five ranger districts in the Siuslaw National Forest, only the Mapleton District does not have an environmental impact statement for a separate unit plan. The Forest Service makes detailed, site-specific plans for individual timber sales and prepares an environmental assessment for each sale. These individual assessments neither assess nor consider the cumulative impacts of all the proposed timber sales or the impact of nearby timber harvests which are not conducted by the Forest Service.

In December, 1982, the Forest Service issued a Seven Year Action Plan for the Mapleton District which contains the general location, the approximate lengths of proposed roads, and the approximate volume of timber to be removed from each timber sale. The Seven Year Action Plan implements the harvest level contained in the 1979 TR Plan. Each year a new seven year plan is adopted which deletes the proposed timber sales actually sold and which adds new sales for the seventh year.[11] The current Seven Year Action Plan proposes to harvest, primarily by clearcutting, approximately 100 million board feet a year.

In January, 1983, plaintiffs administratively appealed the Seven Year Action Plan. In February, 1983, the Siuslaw National Forest supervisor notified plaintiffs that the Seven Year Action Plan was not a decision document, and, therefore, could not be reviewed administratively. The Regional Forester upheld this ruling. Plain-

tiffs have also appealed many of the individual timber sales in the Seven Year Action Plan. The Forest Service has rejected all of them.

### Contentions of the Parties

Plaintiffs contend that the Forest Service (1) violated either the Church Clearcutting Guidelines or the National Forest Management Act; (2) violated the Multiple Use Sustained Yield Act by clearcutting, which impaired the productivity of the land; and (3) did not comply with the National Environmental Policy Act (NEPA). Plaintiffs seek injunctive relief for these violations.

Defendant Forest Service contends (1) the Church Clearcutting Guidelines are not enforceable, or, if enforceable, they have not been violated; (2) the National Forest Management Act is inapplicable; (3) the Multiple-Use Sustained-Yield Act is not subject to judicial review because Congress has committed decisions under the Act to Forest Service discretion; (4) the Seven Year Action Plan does not require an environmental impact statement because it is not a proposal for major federal action; (5) the 1979 Environmental Impact Statement and individual environmental assessments satisfy NEPA requirements; and (6) violations of NEPA should not automatically result in an injunction, but instead, the court should balance the hardships.

The defendant-intervenors adopt the Forest Service's arguments and legal conclusions. In addition, they contend that (1) plaintiffs' NEPA claims are barred by laches because plaintiffs failed to timely challenge the 1979 Environmental Impact Statement; and (2) the economic and social effects of an injunction outweigh plaintiffs' recreational use.

### Discussion

#### A. Church Clearcutting Guidelines.

In March, 1972, the Senate Subcommittee on Public Lands published a set of guide-

---

10. At more than one point, the Environmental Impact Statement recognized that the impact will be greater in areas of concentrated high risk lands such as those in the Mapleton District.

11. The Seven Year Action Plan is in effect a rolling schedule that is changed and updated every year.

lines for clearcutting on public lands. *Clearcutting on Federal Timberlands, Senate Committee on Interior and Insular Affairs* (March, 1972) (Church Guidelines). The Church Guidelines were a response to growing public concern over timber harvest operations on federal forest lands.

The Church Guidelines prohibit clearcutting on federal lands where "[s]oil, slope or other watershed conditions are fragile and subject to major injury." The members of the Church subcommittee were particularly concerned about landslides, soil erosion, and the destruction of streams and fish habitat.[12] The subcommittee recommended against cutting fragile areas with steep slopes that could not be harvested without major watershed injury.

The Forest Service argues that the Church Guidelines are only recommendations and therefore are not judicially enforceable.[13] This was true until the National Forest Management Act (NFMA) of 1976 was passed. Two alternatives were proposed in the debate on the interim management of the forests pending adoption of the land-use plans which the NFMA required. The Senate version required the Forest Service to develop interim standards and to apply existing Forest Service regulations which incorporate the Church Guidelines. S.Rep. No. 893, 94th Cong., 2d Sess. (1976). The House version required the Forest Service to incorporate the NFMA standards into its regulations "as soon as practicable." H.R.Rep. No. 1478, 94th Cong., 2d Sess. (1976). The Conference Committee adopted the House's language with the proviso that "[t]he conferees agree that 'the Church Guidelines' on clearcutting shall continue to be followed by the Forest Service pending incorporation into all unit plans of the management standards added [by the NFMA]." S.Rep. 94–1335, 94th Cong., 2d Sess. (Conf.) at 24, *reprinted in* 1976 U.S.Code Cong. & Ad.News, 6662, 6726.

■ This Conference Committee report was the basis for the Fifth Circuit's holding that Congress had explicitly intended to permit clearcutting on federal land as long as the Forest Service complied with the Church Guidelines. *Texas Committee on National Resources v. Bergland*, 573 F.2d 201, 209–10 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978). The Ninth Circuit also recognizes the binding authority of the Church Guidelines. In *California v. Block*, 690 F.2d 753, 775 (9th Cir.1982), the court noted that Congress had "placed its own restrictive guidelines on timbering practices to be used on all national forests pending the development of permanent NFMA guidelines." In my view, the Church Guidelines are the outer boundary of the Forest Service's discretion and are judicially enforceable.

■ Past timber harvests have inflicted serious damage on the fisheries in the Mapleton District. The Forest Service concedes this, but asserts that improved harvesting techniques and mitigation measures will prevent similar damage from the timber sales proposed in the Seven Year Action Plan. At first glance, the Forest Service appears to comply with the restrictions in the Church Guidelines. The Forest Service requires that an interdisciplinary team, consisting of resource experts (e.g., soil scientists, fishery biologists) prepare

12. *See* Clearcutting on Federal Timberlands, Senate Committee on Interior and Insular Affairs (March, 1972); *Clearcutting Practices on National Timberlands, 1971: Hearings Before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs*, 92d Cong., 1st Sess. (1971).

13. The Forest Service and defendant-intervenors also argue that the National Forest Management Act has replaced the Church Guidelines. At the same time, they argue the clearcutting restrictions in the NFMA are not binding because the Siuslaw National Forest has not adopted a land-use plan under the NFMA. This contention, that because of timing they fall through the cracks, is tantamount to saying the Forest Service's actions are unreviewable during this period. The Forest Service is probably correct that the NFMA does not apply until a NFMA plan is adopted for the Siuslaw National Forest, but Congress did not leave a void when it enacted the NFMA. The Church Guidelines still apply.

and evaluate each timber sale. If the interdisciplinary team determines that an area cannot be harvested without major injury, then the area is not harvested. An essential part of this determination, that no serious damage will result from the timber sales, rests on the assumption that Forest Service mitigation measures are effective. There is insufficient evidence to conclude that these timber sales will or will not result in major injury to fisheries. Because of this factual uncertainty and because the Forest Service has adopted new harvesting techniques and mitigation measures, I reject plaintiffs' contention that the Church Guidelines alone are a sufficient ground on which to enjoin the Seven Year Action Plan.

The Church Guidelines direct that only where it is essential for the care and production of trees (silviculture) in the region may the Forest Service engage in clearcutting. Plaintiffs have not shown that clearcutting on the Mapleton District is not silviculturally essential. They only argue that the Forest Service failed to make a formal finding to that effect. Since December, 1982, the Forest Service has corrected this technical defect. It has evaluated the available silvicultural methods for every timber sale and has concluded that clearcutting is essential. The Forest Service has not violated this particular Church Guideline. The Forest Service has special expertise in this area, and its determination of what is silviculturally essential is entitled to great weight.

B. *The Multiple-Use Sustained-Yield Act.*

■ The Multiple-Use Sustained-Yield Act of 1960 (MUSY) directs the Forest Service to "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529. These uses include outdoor recreation, range, timber, watershed, wildlife, and fish, 16 U.S.C. § 528. The Forest Service has wide discretion to weigh and decide the proper uses within any area. *Sierra Club v. Hardin,* 325 F.Supp. 99, 123 (D.Alaska 1971). Plaintiffs concede that MUSY is largely discretionary, but they argue that the requirement that the Forest Service manage the forests "without impairment of the productivity of the land" 16 U.S.C. § 531(a), (b) creates a substantive, non-discretionary standard. Plaintiffs argue that clearcutting impairs the productivity of the land by seriously damaging fish habitat.

The Forest Service and the defendant-intervenors argue that agency decisions under MUSY are not reviewable because they are committed to agency discretion[14] and because the non-impairment standard in the statute is "drawn in such broad terms ... that there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971).

■ The standards in MUSY are broad, but they do exist. MUSY is not entirely discretionary. The Forest Service must "consider certain factors in the administration of the national forests or to comply with certain procedures when disposing of the public domain." *Hardin,* 325 F.Supp. at 113. Plaintiffs' interpretation of the non-impairment standard must be considered in the context of the statute. The focus of MUSY is on the multiple use and sustained yield of many resources, including timber and fish. Congress authorized the Forest Service to decide which areas and resources to emphasize. As long as the Forest Service considers the other competing uses, the courts are reluctant to overrule its decisions.[15] *Hardin,* 325

---

**14.** The Ninth Circuit Court of Appeals considered the same sections of MUSY (16 U.S.C. §§ 528, 529, and 531) in *Perkins v. Bergland,* 608 F.2d 803, 806 (9th Cir.1979) and described them as containing general clauses and phrases not standards. MUSY's language does not provide "concrete limits" on agency discretion, but "breathe[s] discretion at every pore."

**15.** To some extent emphasis on one use will entail impairment of another use. It is the extent of this impairment that is determinative. Even in those cases which prohibited clearcut-

F.Supp. at 123–24. The Forest Service has adopted measures to protect and enhance fish habitats in the Mapleton District. The proposed timber sales should not be enjoined under MUSY because of past damage to fish habitats.

In view of the broad language of the statute, I hold that the Forest Service has not violated MUSY, and plaintiffs' claim under MUSY is denied.

### C. *National Environmental Policy Act.*

■ The National Environmental Policy Act (NEPA) requires an environmental impact statement on "every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment." NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C). An agency's determination that an environmental impact statement is not required will be upheld unless it is unreasonable. *Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir. 1982).

The Forest Service and defendant-intervenors argue (1) that the Seven Year Action Plan is not a proposal for major federal action and, therefore, does not require an environmental impact statement; and (2) even if an environmental analysis is required, the Environmental Impact Statement in the 1979 TR Plan and the individual environmental assessments satisfy NEPA's requirements.

(1) *Does the Seven Year Action Plan require an Environmental Impact Statement?*

The Forest Service argues that the Seven Year Action Plan is not a major federal action but only a flexible planning schedule. The Council on Environmental Quality (CEQ) has issued regulations to implement NEPA. These regulations are binding on all federal agencies and have been expressly adopted by the Forest Service. Under CEQ regulations, " '[m]ajor Federal action' includes actions with effects that may be

ting under the Organic Act 1897, the courts held that clearcutting did not violate MUSY. *Zieske*

major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. The regulations also provide that a proposal "exists at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated". 40 C.F.R. § 1508.23. What the agency calls the action is irrelevant.

The Seven Year Action Plan implements an orderly timber sale program in the Mapleton District by the careful planning and selection of sale areas. The tentative nature of some of the sales is irrelevant. A plan to construct generating plants and execute industrial power contracts is a proposal under § 102(2) of NEPA. *Port of Astoria v. Hodel,* 595 F.2d 467 (9th Cir. 1979). The court required the Bonneville Power Administration (Bonneville) to prepare an environmental impact statement on the plan in spite of Bonneville's objections that the contracts were contingent and the details uncertain. In *Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848 (9th Cir.1979), the Department of the Interior argued that an environmental impact statement was not required for a water marketing program because the number of water customer contracts was uncertain. The court required an environmental impact statement. Here the Forest Service has selected seventy-five timber sales and decided their locations, road construction requirements, and approximate board foot harvest levels. Some sales have been consummated and environmental assessments have been performed on more than half of the remaining proposed sales. Except for one sale that was deferred, none of the environmental assessments concluded that a timber sale should not be harvested. The Forest Service's long-range marketing program, like the programs in *Port of Astoria* and *Environmental Defense Fund,* constitutes a proposal under NEPA.

*v. Butz,* 406 F.Supp. 258, 259 (D.Alaska 1975).

To show that a proposal will significantly affect the human environment, a plaintiff must " 'alleg[e] facts which, if true, show the proposed project *may* significantly degrade some human environmental factor.' " *Foundation for North American Wild Sheep*, 681 F.2d at 1177–78, *citing Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.1981) (emphasis in original). Plaintiffs are not required to show that the action will significantly affect the environment. In *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir.1973), which involved two timber sales totaling 15.7 million board feet of timber located in the Teton National Forest, the court held that the sales constituted a major federal action which significantly affected the human environment. The court required the Forest Service to prepare an environmental impact statement.[16] Here, the Mapleton District's Seven Year Action Plan proposes to cut approximately 100 million board feet of timber a year and to construct (or reconstruct) 176.4 miles of road. It is a proposal for major federal action which will significantly affect the human environment. I hold that the Forest Service acted unreasonably when it failed to prepare an environmental impact statement for this proposal.

(2) *Do the existing environmental documents for the Mapleton District satisfy NEPA?*

The Forest Service contends that the 1979 Environmental Impact Statement for the Timber Resources Plan and the environmental assessments accompanying each timber sale together satisfy NEPA.

(a) *Timber Resource Plan Environmental Impact Statement.*

The TR Plan describes a ten-year timber cutting program for the Siuslaw National Forest. The Environmental Impact Statement accompanying this forest-wide proposal is a "programmatic environmental impact statement." [17] It averages the impact of the TR Plan's proposed harvest levels over the entire Siuslaw National Forest. It does not specifically discuss the Mapleton District.

The TR Plan determines the harvest levels for all of the Siuslaw National Forest. The Environmental Impact Statement considers the impact of these harvest levels. A separate environmental analysis was not done on the Mapleton District. The Forest Service contends that a separate analysis is not necessary because the impact of the Seven Year Action Plan had already been considered in the TR Plan. In support of this contention, the Forest Service relies on *Ventling v. Bergland*, 479 F.Supp. 174 (D.S.D.), *aff'd. mem.*, 615 F.2d 1365 (8th Cir.1979). In *Ventling*, the court held that the Forest Service was not required to prepare a site-specific environmental impact statement on four timber sales. The court found that NEPA was satisfied because there was a comprehensive programmatic environmental impact statement and the sale area was indistinguishable from the rest of the forest. The court emphasized the homogeneity of the Black Hills National Forest. It noted that plaintiffs had not identified any characteristics of the proposed timber sales which varied significantly from the conditions examined in the programmatic environmental impact statement.[18]

---

**16.** In enjoining the Forest Service from conducting the planned sales, the court said, "[t]he clearcutting of the timber planned obviously will have a significant effect on the environment for many years." *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d at 1250.

**17.** A programmatic environmental impact statement presents a broad-based, long-range plan that discusses the overall impacts of a proposed action.

**18.** The court said if there were "significant differences between the specific site and the preva-

lent conditions examined in the programmatic EIS, a site-specific EIS would be required." *Ventling,* 479 F.Supp. at 180. *See also Natural Defense Council, Inc. v. Administrator,* 451 F.Supp. 1245, 1258 (D.D.C.1978) *modified,* 606 F.2d 1261 (D.C.Cir.1979) ("[a]s a general rule, the preparation of a PEIS [programmatic environmental impact statement] does not obviate the necessity of preparing a particularized impact statement for individual major actions that are components of a subject program.")

■ Unlike the forest in *Ventling*, the Mapleton District varies significantly from the rest of the Siuslaw National Forest. The Mapleton District has the greatest concentration of high-risk and landslide-prone land in the Siuslaw National Forest. The impact of harvesting on these lands will therefore be much greater than the average for the entire forest. The TR Plan Environmental Impact Statement sets forth the average reduction of fish habitat for the entire forest. The greatest reductions in fish habitat have occurred in the Mapleton District which is in the southern portion of the forest. The Environmental Impact Statement does not contain separate figures for the Mapleton District. Unlike *Ventling*, the Siuslaw National Forest is not "homogeneous."

The Forest Service did not intend for the TR Plan's Environmental Impact Statement to satisfy its NEPA obligations for the Mapleton District. The TR Plan decided how much timber would be harvested in the Siuslaw National Forest for a ten-year period. The TR Plan specifically provided for a separate unit management plan and also an environmental impact statement on the Mapleton District. The Forest Service prepared plans and environmental impact statements for each ranger district in the Siuslaw National Forest except the Mapleton District. In my view, the TR Plan's Environmental Impact Statement does not provide the specific environmental analysis on the Mapleton District Seven Year Action Plan that is required by NEPA.

(b) *Individual Timber Environmental Assessments.*

The Forest Service intends to prepare an environmental assessment for each timber sale in the Seven Year Action Plan. The purpose of an environmental assessment is to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). These are site-specific analyses, and they concentrate on the specific issues presented in each timber sale. They supplement the analysis in the programmatic environmental impact statement. 40 C.F.R. § 1502.20. The Forest Service argues that these environmental assessments, in conjunction with the TR Plan's Environmental Impact Statement, are enough to satisfy NEPA.[19] I disagree.

■ The Forest Service can comply with NEPA by preparing a programmatic environmental impact statement and site-specific environmental assessments. *Oregon Environmental Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir.1983). Nevertheless, this court must review "the sufficiency of the environmental analysis as a whole." *Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475 at 1480 (1983) (*SOCATS*). The environmental assessments together with the TR Plan's Environmental Impact Statement must provide the information necessary for " 'the decision-maker to consider the environmental factors and to make a reasoned decision.' " *SOCATS* at 5682; *see also Oregon Environmental Council*, 714 F.2d at 904–05.

An examination of the environmental assessments on timber sales in the Seven Year Action Plan reveals two flaws in the environmental analysis. First, there are no Forest Service documents which consider the cumulative impact of the timber sales or of the other harvests in the Mapleton

**19.** Defendant-intervenors also assert that I should consider the detailed standards for clearcutting contained in a forest-wide evaluation entitled, *Analysis of the Management Situation.* Defendant-intervenors rely on *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir.1980) to support the use of outside information to supplement an environmental impact statement. The *Gribble* court, however, did not let in material after the agency's decision had already been made. *Callaway*, 524 F.2d at 79, 92, faces this issue directly. The court there said "[a]lthough an EIS may be supplemented, the critical agency decision must, of course, be made after the supplement has been circulated, considered and discussed in the light of the alternatives, not before. Otherwise, the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it." The *Analysis of the Management Situation* was completed in February, 1983, long after the clearcutting decisions were made in the TR Plan and the Seven Year Action Plan.

district. Second, there are no Forest Service documents which discuss the uncertainty of leave areas as a mitigation technique.[20]

### i. Cumulative Effects

NEPA's comprehensive approach to environmental decision-making is designed to recognize and evaluate the long-term and cumulative effects of small and both related and unrelated actions. Council on Environmental Quality regulations require that the scope of an environmental impact statement include cumulative impacts. 40 C.F.R. § 1508.25. Cumulative impact is defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7

In *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir.1975), the court held that an environmental impact statement for a Navy dumping proposal was inadequate under NEPA when it failed to discuss other dumping and dredging projects in the same area. It rejected the Navy's argument that many of the other projects had not been finally approved or that those projects were unrelated to the Navy's proposal. The court found that the other projects were more than mere speculation, that they were planned for the same geographical area,

involved dredging and disposal of spoil, and presented similar pollution problems. The court therefore required the environmental impact statement to consider all of the projects in the area.

The watersheds in the Mapleton District will have the impact of (1) seventy-five timber sales from the Seven Year Action Plan; (2) timber sales on adjoining Bureau of Land Management land; and (3) timber harvests on private lands. These harvests are planned for the same geographical area, involve extensive clearcutting, and present similar threats to fish habitats. Although the Forest Service cannot control harvesting activities on adjacent non-Forest Service lands, clearcutting on these lands will have an impact on the fish habitat, and this other harvesting activity must be considered.

The Forest Service has not assessed the cumulative impact of all harvesting in and around the Mapleton District. The individual timber sale environmental assessments do not reveal that impact, and the TR Plan's Environmental Impact Statement is too general to address the specific problems in the Mapleton District. CEQ regulations and the reasoning in *Callaway* require that the Forest Service analyze the cumulative impacts in order to comply with NEPA.[21] The Forest Service has failed to make that analysis.

### ii. Worst Case Analysis

The CEQ regulations require a "worst case analysis" when an agency is faced with incomplete or unavailable information. 40 C.F.R. § 1502.22.[22] This regulation cod-

---

**20.** Plaintiffs also assert that the environmental assessments are invalid because the Forest Service does not have a no-action alternative. Out of the thirty-five environmental assessments performed, only one was not approved and that one was only deferred. I do not reach this issue.

**21.** The Forest Service and defendant-intervenor's reliance on *Friends of the Earth v. Coleman,* 513 F.2d 295 (9th Cir.1975), is misplaced.

*Friends of the Earth* involved two distinct projects (a federal highway and a state canal) which had entirely different environmental consequences. The court held that excavating the canal to obtain fill for the highway was not such an irreversible commencement of the canal to warrant a formal NEPA evaluation of the canal's environmental impact.

**22.** 40 C.F.R. § 1502.22 reads as follows:
*Incomplete or unavailable information.*

ifies prior case law,[23] and it is binding on all federal agencies.

The "worst case analysis" regulation sets out an ordered process which an agency must follow when the facts on which the agency relies are uncertain. The agency must first determine if the information is important or essential. Then it must decide whether the information can be obtained. If not, or if it can only be obtained at great cost, then the agency must do a worst case analysis. The agency must consider the range of worst possible effects and the likelihood of their occurrence. It must also consider the cost of proceeding without the information. *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1244–45 (9th Cir.1984) (*SOS*).

The effectiveness of leave areas in preventing landslides is at the heart of the Forest Service's case. The Forest Service admits that its practices damaged fish habitats in the past, but it asserts that leave areas and other mitigation techniques will prevent similar damage in the future. There is little evidence to support this assertion. Only twelve headwall leave areas have been set aside in the Mapleton District. Of these, only five have been suc-

cessful in preventing landslides. The only other evidence of leave area effectiveness consists of the Delphi survey results [24] and the unsupported predictions of the Forest Service personnel. The Forest Service does not discuss the uncertainty of leave-area effectiveness.[25] It does not question the effectiveness of leave areas in calculating impact on fish habitat; it merely assumes it to be approximately 100 percent.[26]

Landslides damage fish habitats, but it is uncertain whether leave areas used by the Forest Service will effectively prevent landslides. Without accurate evidence of the effectiveness of leave areas as mitigation techniques, the Forest Service must prepare a worst case analysis. *SOS*, at 1245, *SOCATS*, at 1479–80.

 The Forest Service has not made a worst case analysis. It did not make such an analysis in its TR Plan Environmental Impact Statement nor in subsequent environmental assessments. *SOCATS*, at 1480. It must do it now.

D. *Laches.*

Defendant-intervenors contend that this action is barred by laches. They argue

---

When an agency is evaluating significant adverse effects on the human environment in an environmental impact statement and there are gaps in relevant information or scientific uncertainty, the agency shall always make clear that such information is lacking or that uncertainty exists.

(a) If the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If (1) the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are exorbitant or (2) the information relevant to adverse impacts is important to the decision and the means to obtain it are not known (e.g., the means for obtaining it are beyond the state of the art) the agency shall weigh the need for the action against the risk and severity of possible adverse impacts were the action to proceed in the face of uncertainty. If the agency proceeds, it shall include a worst case

analysis and an indication of the probability or improbability of its occurrence.
40 C.F.R. § 1502.22

**23.** The Ninth Circuit Court of Appeals has said that the worst case analysis regulation codifies prior NEPA case law. *SOCATS*, at 1478.

**24.** There are inherent difficulties in using the predictions obtained from the Delphi Survey technique. *See infra* note 8. However, the Delphi Survey results appear more reliable than a flat-out assertion that a particular Forest Service expert's success rate was 80 percent when there is no evidence to support that assertion.

**25.** It is unclear whether the TR Plan assumed a 100 percent effectiveness for all leave areas or just stream buffer zones. The list of assumptions contained in the TR Plan is not a worst case analysis; it does not admit any uncertainty.

**26.** The Forest Service starts with a 100 percent efficiency rate and adjusts it down according to the professional judgment of the interdisciplinary team. This adjustment is not significant. The average assumed efficiency is 99.9 percent.

that the primary document at issue is the TR Plan Environmental Impact Statement and not the Seven Year Action Plan. Plaintiff Siuslaw Task Force commented on the TR Plan when it was first proposed, but it did not raise any of the issues presented in this action. Plaintiffs did not appeal the Forest Service's adoption of the TR Plan. Defendant-intervenors therefore argue that plaintiffs cannot, five years later, challenge the adequacy of the TR Plan.

In *Sierra Club v. Block*, 576 F.Supp. 959 (D.Or.1983), Judge Owen Panner applied collateral estoppel to bar a plaintiff from raising issues in this court that had been previously decided in an unappealed administrative proceeding. There, the programmatic environmental impact statement designated the sale area as general forest. The Sierra Club filed an administrative appeal from that statement's evaluation of the wilderness potential for the sale area. It did not seek judicial review from the adverse administrative ruling, but in a later action it contended that a timber sale was invalid because the programmatic environmental impact statement failed to adequately consider the wilderness potential of the sale area.

In *Block*, significant progress had already been made on the timber sale, construction of roads had already commenced, and contracts had been signed. Here, plaintiffs brought this action months before the timber sales were scheduled. In *Block*, both sides contested the wilderness designation for the sale area in the administrative proceeding. Here, the Forest Service informed plaintiffs that a separate unit environmental impact statement would be prepared on the Mapleton District within a year. It was never prepared. When plain-

tiffs were unable to challenge the specific plans in this expected statement, they filed this action.

Plaintiffs have the right to litigate those localized issues not adequately considered by the TR Plan Environmental Impact Statement.[27] As Judge Panner noted in *Block:*

> A programmatic EIS will often be insufficient as it relates to site-specific actions. This may be because it does not contain sufficient detail to satisfy NEPA requirements, or because new information is revealed subsequent to its preparation.

*Block,* at 964.

■ To bar an action for laches, this court must find both a lack of diligence and prejudice to the moving party. *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980). Here, defendant-intervenors have not shown lack of diligence or prejudice.

### E. Injunctive Relief.

■ The Forest Service and defendant-intervenors contend that before the proposed timber sales may be enjoined, the court must balance the equities. The Ninth Circuit Court of Appeals has recently ruled that this balancing is not necessary. *SOS,* at 1250. When an agency fails to comply with NEPA, irreparable damage is presumed, and absent unusual (or rare) circumstances,[28] an injunction should issue. *SOS,* at 1250. There are no unusual circumstances here.

It is ordered that an injunction shall issue enjoining the Forest Service from offering for sale any timber in the Mapleton

27. *See Kettle Range Conservation Group v. Block,* No. C–83–590, slip op. at 7 (E.D.Wash., Oct. 6, 1983). The court rejected a laches defense where plaintiffs challenged a timber sale environmental assessment and a programmatic environmental impact statement. The court noted "[i]t is because defendants have consistently taken the position that the EA and the EIS must be considered together that the challenge to the validity of the EIS comes at this time. Accordingly, the doctrine of laches has no appli-

cability in this action." These facts are strikingly close to the ones here.

28. An example of an unusual circumstance is presented in defendant-intervenors' primary case, *American Motorcyclist Association v. Watt,* 714 F.2d 962 (9th Cir.1983). In *Watt,* the court refused to issue the injunction in order to protect the environment. Issuing the injunction would have harmed the environment, in contradiction to the purpose of NEPA.

District Seven Year Action Plan until it complies with the National Environmental Policy Act as set forth in this opinion or until further order of the court.