**SIERRA CLUB, a non-profit corporation; the Wilderness Society, a non-profit corporation, Texas Committee on Natural Resources, a non-profit trust**

**v.**

**John R. BLOCK, in his official capacity as Secretary of Agriculture, et al.**

**No. L–85–69–CA.**

United States District Court,
E.D. Texas,
Lufkin Division.

June 4, 1985.

Larry Daves, Daves & Hahn, Tyler, Tex., Douglas L. Honnold, Sierra Club Legal Defense Fund, Inc., Denver, Colo., for plaintiffs.

Robert Wortham, U.S. Atty., Ruth L. Harris, Asst. U.S. Atty., Tyler, Tex., for defendants.

## ORDER

STEGER, District Judge.

### I. BACKGROUND

On May 24, 1985, the Court heard the plaintiff's Motion for a Preliminary Injunction together with the government's responses to the plaintiff's Motion. The focus of this dispute concerns the effectiveness of cutting pine trees to control the spread of Southern Pine beetles in Texas

Wilderness Areas.[1] Plaintiffs contend that the Forest Service's present control techniques should be more carefully examined in a specific Environmental Impact Statement. The government believes exhaustive research has already been completed that establishes the usefulness of present control techniques.

Pending a trial on the merits and the possible preparation of a new impact statement, the plaintiffs have asked this Court to halt all timber cutting in the Texas Wilderness Areas. This Court is unwilling to impose such a rigid and comprehensive restraint on the management of these areas in light of the disastrous effects it could have. The Court finds it necessary, however, to grant plaintiffs some limited relief as outlined below.

■ To merit preliminary injunctive relief, the plaintiffs must establish four facts: (1) There is a substantial likelihood that plaintiffs will succeed on the merits, (2) there is a substantial threat of irreparable harm absent an injunction, (3) the irreparable harm threatened is greater than the harm that an injunction could cause, and (4) the public interest would be served by issuing an injunction. *Tubwell v. Griffith*, 742 F.2d 250, 251 (5th Cir.1984); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). Because the Court is unwilling to grant plaintiffs' draconian request, yet finds it necessary to grant some relief, these four elements must be examined twice.

### II. PLAINTIFFS' REQUESTED RELIEF

#### A. Success on the Merits

For the purposes of this motion, the plaintiffs chose to develop only one of their three claimed violations. This discussion will be limited, therefore, to the likelihood that plaintiffs would succeed on the merits of the National Environmental Policy Act (NEPA) claim.

---

1. The five Texas Wilderness Areas involved in this dispute are known as Big Slough (in the Davy Crockett National Forest), Turkey Hill (Angelina), Little Lake Creek (Sam Houston), Upland Island (Angelina), and Indian Mounds.

In the brief supporting their application for a preliminary injunction, the plaintiffs make the assumption that no Environmental Impact Statement was prepared prior to choosing a method for the control of Southern Pine Beetles in Texas. In response, the government enumerated five Environmental Impact Statements,[2] one Environmental Assessment with two amendments,[3] and numerous reports and studies[4] all directed in whole or in part to the control of beetle infestations in the Texas National Forests. The question now is not whether these documents exist, but whether they are sufficient to comply with the requirements of NEPA.

■ In general, NEPA requires all federal agencies to evaluate any unavoidable adverse environmental impacts that may attend agency actions. *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983); 42 U.S.C. § 4332(C). NEPA's ultimate goal is to ensure that federal agencies make fully informed and well-considered decisions. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). To attain that goal, NEPA created the Council on Environmental Quality and empowered it to promulgate regulations designed to guide federal agencies in the preparation of the Environmental Impact Statements that were vaguely defined by NEPA. 42 U.S.C. §§ 4342, 4344.

One section of the Council's regulations has earned a spotlight in this action. *See* 40 C.F.R. § 1508.28 (1984). The government maintains that its five prior Environmental Impact Statements discussed the pine beetle issue in a broad framework. Its subsequent Environmental Assessment incorporated the findings of these earlier statements and examined the control issue only in regard to the Texas Wilderness Areas. In the government's opinion, this procedure satisfies NEPA's review requirements as outlined in the Council's regulations.

Plaintiffs contend that the environmental assessment and its two amendments are insufficient to allow the government to make a reasoned decision in this case. Plaintiffs have cited three cases where courts have decided that Environmental Assessments were inadequate, yet all three are distinguishable from the present action. In *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985), an Environmental Assessment was prepared analyzing the environmental impacts from the construction of a gravel logging road in a section of the Nezpearce National Forest in Idaho. The assessment did not discuss the adverse impacts of the timber cutting that the road was designed to facilitate, however. The court ordered the compilation of an Environmental Impact Statement that would consider the cumulative future impacts of the road and subsequent timber cutting. 753 F.2d at 760. Similarly, in *Conner v. Burford*, 605 F.Supp. 107, 22 E.R.C. 1605 (D.Montana 1985), an environmental assessment considered the effects of leasing mineral rights in the Flathead and Gallatin National Forests of Montana. The assessment failed to consider the impact of possible development of those mineral rights after

---

**2.** The five Environmental Impact Statements are entitled as follows: Strategy for Control of the Southern Pine Beetle in the Southeastern United States (1974) (includes Texas); Final Unit Plan and Environmental Impact Statement for the Sabine National Forest (1978); Final Environmental Impact Statement and Land Management Plan for the Sam Houston National Forest (1978); Final Environmental Impact Statement and Timber Management Plan for the Angelina National Forest (1978); and the Final Environmental Impact Statement and Timber Management Plan for the Davy Crockett National Forest (1980).

**3.** The Environmental Assessment Report is entitled "Southern Pine Beetle Control in RARE II Recommended Wilderness and Further Planning Areas in the National Forests in Texas" (July 1983), with a first amendment issued in October 1983 and a second amendment issued in October 1984.

**4.** The various reports and studies may be found in Government's Exhibits 10 through 23.

they were leased. The court ordered a new statement that would account for these potentially deleterious effects. 605 F.Supp. 107, 22 E.R.C. at 1608.

In both *Thomas* and *Conner*, the environmental assessments were insufficient because they failed to consider potentially harmful developments that were certain to flow from the initial agency actions. It was as if the government had examined the consequences of building a dam without considering the effects of the water that would collect behind the dam. No such deficiency infects the assessment in this action. The cutting of timber to control pine beetles is not a necessary prelude to other, more extensive activities.

The third case cited by plaintiffs to attack the sufficiency of the assessment is *National Wildlife Federation v. U.S. Forest Service*, 592 F.Supp. 931 (D.Oregon 1984). Environmental groups filed suit to halt the sale of timber from the Siuslaw National Forest in Oregon. The trial court decided that the Environmental Assessments were inadequate for two reasons. First, a separate assessment was prepared for each harvest, thus preventing an evaluation of the cumulative effects of all the harvests. 592 F.Supp. at 942. By contrast, the assessment in this case is directed to an evaluation of the overall impacts from beetle control operations. There is not a separate assessment prepared for each area controlled. Second, the Oregon assessments failed to discuss the efficacy of the measures planned to prevent landslides in the harvested areas. 592 F.Supp. at 943. By contrast, the plaintiffs in this action failed to suggest any similar omission in the Environmental Assessment now under consideration.

■ That Environmental Assessment, issued in July of 1983, considers all of the potentially adverse environmental implications that could result from control of Southern Pine beetles in what were then "RARE II" Recommended Wilderness and Further Planning areas. In addition, it reviews the consequences of alternative methods of control and of no control. The second amendment to the assessment, which is in effect an additional assessment, further investigates the effects of beetle control in the new Texas Wilderness Areas.

■ In light of the facts presently developed, the Court believes that the defendants have evaluated the environmental effects of the control program in good faith, objectively, and in detail, and they have examined the alternatives sufficiently to permit a reasoned choice from among various options. *See Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262, 266 (5th Cir.1984). Under these circumstances, it is apparent that the government has complied with NEPA, and plaintiffs have failed to demonstrate the likelihood of success on the merits.

### B. Irreparable Harm

For the purposes of deciding this motion, the Court will presume that the loss of a significant number of trees constitutes an irreparable harm, at least to the extent that decades are required to replace the lost trees and their accompanying undergrowth. Once this presumption is adopted, however, one of the unique features of this case becomes apparent. If the plaintiffs are correct, continued timber cutting will mean the loss of thousands of pine trees in Texas Wilderness Areas for no valid reason. If the government is correct, a cessation of timber cutting will lead to the proliferation of Southern Pine beetles and the loss of even more thousands of pine trees in the Wilderness Areas. Either way, irreparable harm results. Since the merits of these contrasting positions remain to be determined, the resolution of this dilemma must lie in the balancing of the two potentially irreparable losses.

### C. Balancing the Losses

To satisfy the third prerequisite for injunctive relief, the irreparable harm identified by the movant must be greater than the harm that an injunction could cause. It is in this regard that the Court finds the plaintiffs' motion at its weakest.

The irreparable harm identified by the plaintiffs consists of the trees that will be cut as the Forest Service's control program continues. The harm is easily identified and quantified. The losses are certain to occur. They are not without a purpose, however.

The Forest Service earnestly believes that fewer trees are lost because of its control program than would be lost if Southern Pine beetles were allowed to proliferate without restraint. By saving more trees in the long run, and by focusing particular attention on areas inhabited by the endangered Red Cockaded Woodpecker, the Forest Service also believes that its control methods best prevent the spread of beetles to lands adjoining the Wilderness Areas and best protect the threatened woodpeckers. Since this Court must choose the path of least destruction, these beliefs must be carefully considered. They will be evaluated in the light of the criticisms levelled by the plaintiffs.

Plaintiffs initially argue that since there is no scientifically established method for the direct control of Southern Pine beetles, the Forest Service's timber cutting effort does nothing but waste the trees and their accompanying undergrowth. *See, e.g.,* hearing testimony of Dr. David Wood. The government agrees that there is no known method to eradicate these beetles on an area wide basis, but are convinced that techniques directed at containing spot growth of beetles are 90% effective and essential. *See* hearing testimony of Dr. Ron Billings and David Oates. In short, the Forest Service has found that no way exists to prevent beetle outbreaks, but when outbreaks do occur, their program contains the new infestations to the spot area where they started.

The plaintiffs maintain that this spot cutting is ineffective. The government concedes that new smaller outbreaks sometimes follow such a cutting. Empirical studies indicate, however, that spot control methods result in a much smaller overall infestation than no control, and therefore cause a much smaller loss of trees. *See*

Gov.Ex. No. 6, at 40, 47; R. Billing and H. Pase, "Spot Proliferation Patterns as a Measure of the Area-Wide Effectiveness of Southern Pine Beetle Control Tactics." (Discusses effects of spot cutting on the serious beetle outbreaks of the mid-1970's and compares those effects to the activity in uncontrolled spots.)

Plaintiffs contend that no method exists to predict the growth of beetle infestations or determine hazard areas of likely infestations. *See* Affidavit of Dr. Frederick M. Stephen; hearing testimony of Dr. David Wood. Defendants agree that population predictions on an area-wide basis are speculative, but that growth in individual spots can be predicted. *See* Gov.Ex. No. 6 at 31, R. Billings and B. Hynum, "Guide for Predicting Timber Losses from Expanding Spots in East Texas." The Billings and Hynum method takes into account the number of trees infested, the size of the infestation, and its growth over the first 30 days after discovery, and extrapolates that data to predict future growth of that spot. In addition, the government has rated the Texas Wilderness Areas based on the likelihood of future spot infestations. The hazard ratings primarily focus on the fact that these areas contain the older stands of pine trees preferred by Southern Pine beetles. *See* Gov.Ex. No. 6 at 53, W. Nettleton and J. Smith, "Hazard Rating, Predicted Losses, and Control Alternatives for Southern Pine Beetle Damage on RARE II Proposed Wilderness and Further Study Areas on the National Forests in Texas." Three of the five Texas Wilderness Areas are partially or entirely in high hazard areas. *See* Gov.Ex. No. 24. Overall, these predictive studies have been proven accurate by subsequent experience. *See* hearing testimony of Dr. Ron Billings.

Plaintiffs challenge the conclusions of these studies because they have not been replicated. *See* hearing testimony of Dr. David Wood. This challenge overlooks the fact that the Forest Service's cutting techniques have been used for 15 years on over 5,000 spot infestations. Hearing testimony of Dr. Ron Billings. Numerous opportuni-

ties have arisen where the effectiveness of these techniques could be compared to uncontrolled spots. *See, e.g.,* Gov.Ex. No. 6 at 40 (Billings and Pase study). The most striking examples of the effects of no control can be found in the Four Notch area and the Beech Creek Unit in the Big Thicket. In both areas, over 2,000 acres of pine trees were lost before delayed control techniques could bring the infestations under control. In the Four Notch area, 3,500 acres were ultimately lost, with the bulk of the losses occurring within six months. Hearing testimony of Dr. Ron Billings. Even if the plaintiffs have a valid complaint about the accuracy of some of these studies, they never indicated how serious the flaws were or what margin of error should be allowed.

Finally, plaintiffs contend that the beetle is a part of nature, and should be allowed to run its course. They believe that most infestations will quickly die out of their own accord. Empirical reviews, however, indicate that in 1984, only 50 to 60% of infestations containing fewer than 10 trees went inactive without control. *See* Gov.Ex. No. 20(h) at 7. When the infestations consisted of more than 10 trees but fewer than 30, only 14 to 26% went inactive without control. Where infestations included over 30 trees, only 5 to 20% went inactive without treatment. The Forest Service monitors all areas and uses control methods only when necessary. In Wilderness Areas, the restrictions on control are even more severe. *See* Gov.Ex. No. 9. The empirical data suggest that in most spots, if the Forest Service allowed the beetles to run their course in Wilderness Areas, that course could quickly encompass thousands of acres.

Many of the Texas Wilderness Areas are in high hazard zones, meaning they are particularly susceptible to beetle infestations. Summer months are the most important times for controlling beetles. Hearing testimony of Dr. Ron Billings; Gov.Ex. No. 6. The control techniques result in a net saving of timber. Gov.Ex. No. 20(h). The control techniques best protect Red Cockaded Woodpecker colonies. Where no control was used in the Four Notch area, three colonies were lost, three threatened, and only four remained intact. Affidavit of William M. Lannan at 8; *see also* Gov.Ex. No. 17. Halting the control efforts now would prevent the government from containing beetles during the critical summer months and during a period of peak cyclical infestations. The result would be the loss of thousands of acres of pines instead of hundreds.

On the basis of the facts now developed, the balance weighs heavily against injunctive relief. An injunction halting all cutting could lead to irreparable losses far in excess of those that will occur if the government's cutting program continues. In light of this, the public interest would be disserved if such an injunction were granted. Plaintiffs' Motion for a Preliminary Injunction is DENIED.

### III. COURT–ORDERED RELIEF

■ While the plan outlined in Government Exhibit 9 for the control of Southern Pine beetles in Texas Wilderness Areas appears sound and well-reasoned, there is evidence to suggest that it is not strictly followed. The evidence offered by the plaintiffs revealed the following unexplained deviations:

1. Numerous hardwood trees (oaks, gums, dogwoods, and others) are being cut. Southern Pine beetles do not infest hardwood trees. At one cutting site, as many as 40% of the felled trees were hardwoods. Affidavit of James R. Jackson, ¶ 4. In another area, over 100 hardwoods were cut. Affidavit of Larry D. Shelton, ¶ 12. In some instances, cut hardwoods outnumber cut pines by a two to one margin. Jackson Affidavit, ¶ 5.

Since beetles only attack pines, the cutting of hardwoods is unnecessary. In past control efforts, hardwood trees have not been cut. In testimony before the Subcommittee on Public Lands and National Parks of the House Interior Committee, Dr. Ron Billings (the government's primary witness at the hearing) made the following com-

ments while describing a photograph of the Four Notch controlled area:

> [T]he reason the buffer doesn't show up well in the picture is because the hardwoods weren't cut. The beetles only attack the pines, so it is only necessary to cut the *pines* ahead of the infestation. (Emphasis added.)

Gov.Ex. No. 19 at 105. The cutting of hardwoods at recent beetle control spots was unexplained at the hearing. The only justification offered was the need to remove dense hardwood stands that prevented pines from falling completely to the ground. According to Dr. Billings' testimony, it is important that the cut pines be in a horizontal position. Plaintiffs' Exhibit 3, however, is a slide showing a cut hardwood tree in the foreground, with no nearby pines, and in the background a cut pine, caught on another tree and not in a horizontal position.

2. Some cuts in the Wilderness Areas are in spots where no cuts should take place. The purpose behind control efforts in the Wilderness Areas is twofold: The first goal is to protect Red-Cockaded-Woodpecker-inhabited pines from beetle attack, and the second is to prevent the spread of beetles to lands outside the Wilderness Areas. Gov.Ex. No. 6 at 1; Gov.Ex. No. 9 at 1. Cutting should only occur where necessary to accomplish these two goals. Nevertheless, some cuts are reportedly far away from both woodpeckers and wilderness boundaries. Affidavit of Edward C. Fritz, ¶ 15.

3. Pine trees are at times cut in a manner that will do more to spread beetle infestations than control them. Rather than cutting the trees so that they will fall into the already infested area, they are felled out into uninfested areas. Affidavit of Larry D. Shelton, ¶ 5; Affidavit of George Russell, ¶ 11.

4. The Forest Service does not take advantage of natural boundaries when controlling spot infestations. In some areas, buffer zones have been created despite the existence of nearby natural boundaries such as rivers, cleared land, dense stands of hardwood trees, and developed roads and railroad rights-of-way. Russell Affidavit ¶ 8; Shelton Affidavit ¶ 17; Fritz Affidavit ¶ 12; James Jackson Affidavit ¶ 4.

These four types of activities are outside the scope of the Forest Service's own control guidelines as they are established in Government Exhibit 9. Restraining these activities satisfies the four prerequisites for injunctive relief. The large-scale cutting of hardwood trees does not control beetles since pine beetles only attack pine trees. The cutting of hardwoods and the other activities mentioned above are probably beyond the necessary measures for insect control allowed by law in Wilderness Areas. *See* 16 U.S.C. § 1133(d)(1). There is, therefore, a probability of success on the merits regarding these actions.

The unnecessary loss of trees, especially hardwood trees, is an irreparable harm under the presumption made earlier for the purposes of this order.

To the extent that the four activities listed above do not aid in the control of beetles, restraining them will not cause losses that would outweigh the losses incurred by the activities themselves. For the same reason, the public interest will not be disserved by restraining unnecessary activities.

## IV. INJUNCTION

Plaintiffs' affidavits and hearing testimony demonstrate that the defendants are going beyond their own prescribed control policies in at least some beetle control spots. It is the intent of this Court that the defendants strictly follow their own guidelines as set out in Government's Exhibits 6, 7, 8, and 9. It is, therefore, ORDERED that:

(1) All cutting of hardwood trees shall cease except where absolutely essential to control operations. The presumption is now against the cutting of any hardwood trees, and the government shall bear the burden of justifying any hardwood cutting that is done.

(2) As provided in the Government's Exhibit 6, control activities within Texas Wilderness Areas shall only be conducted where necessary to protect existing Red Cockaded Woodpecker Colonies or to prevent the spread of beetles to lands bordering the wilderness areas.

(3) Pine Trees should be cut in the manner referred to in Government's Exhibits 6, 7, 8, and 9 and specifically explained in Government's Exhibit 14(a). Of primary importance to the Court is the felling of trees in the direction of the infestation rather than away from it.

(4) Wherever possible, the government should take advantage of natural boundaries that will stop beetle proliferation as efficiently as buffer zones. In some places, roads, rivers, hardwood stands, and railroad rights-of-way may be just as effective in containing the beetles and may obviate the necessity for cutting some trees.

(5) The Court recognizes that cutting activities must vary according to the divergent areas and different sizes of infestations that will be encountered. To account for this, the regulations on cutting imposed by this Order, even as limited as they may be, must provide some discretion to the defendants. This discretion must be exercised with one goal in mind: that in Texas Wilderness Areas, only minimally sufficient steps should be taken to control Southern Pine beetles.

(6) To ensure compliance with this Order, the Court will require two things of the government. First, they must supervise cutting activities in Texas Wilderness Areas to ensure that those who actually implement the control measures follow the Forest Service's own guidelines. Second, as each cutting operation is completed, the government must supply plaintiffs' attorneys with information regarding the location and extent of the cut.

(7) In accordance with Rule 65(c) of the Federal Rules of Civil Procedure, applicants will be required to post a bond of one dollar ($1.00). The relief granted is not all that plaintiffs requested, and it only requires the government to more carefully follow its own guidelines. No damages could be incurred under these circumstances.

(8) A trial on the merits will be scheduled as soon as possible in the fall. This will allow both sides adequate time to conduct discovery and otherwise prepare for trial. The Court will contact the attorneys in the next few weeks in order to discuss appropriate scheduling deadlines.