The STATE OF TEXAS, Plaintiff,

v.

UNITED STATES FOREST SERVICE, et al., Defendants.

Civ. A. No. H–86–4224.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 26, 1986.

See also, 5th Cir., 805 F.2d 524.

Renea Hicks, Asst. Atty. Gen., of Tex., Austin, Tex., for plaintiff.

Frank Conforti, Asst. U.S. Atty., S.D. Tex., Houston, Tex., for defendants.

## MEMORANDUM

HUGHES, District Judge.

The State of Texas seeks to halt the site preparation for reforestation with seedling pine trees by the Forest Service because of legally insufficient compliance with the National Environmental Policy Act (NEPA). Immediate, summary relief is denied, and a hearing on the state's application for a

preliminary injunction is scheduled for December 9th.

*Background.*

The Sam Houston National Forest covers 158,000 acres in Texas, essentially southwest and southeast of the town of Huntsville, in Montgomery, Walker, and San Jacinto Counties. The forest is owned by the United States. One parcel of the forest is Four Notch. It is an area of 5,600 acres, part of which had been designated for preservation from logging because of the old age of the pine trees.

In 1978, in conjunction with a long-range management plan, the Forest Service prepared an environmental impact statement (EIS) for the forest. The EIS analyzed various components of land management in the forest including timber foresting, site preparation, prescribed burning, reforestation, and insect control. The soil, water, vegetation, wildlife, forage, aesthetics, air quality, and threatened and endangered species aspects of each of these land management programs was considered. Clearcutting of 1,600 acres per year was planned.

Later, Four Notch was suggested as a potential addition to the Texas wilderness areas (the RARE II designation). In 1983, the southern pine beetle had begun to infest Four Notch. Because of this designation, the Forest Service prepared an environmental assessment to determine the best method to control the southern pine beetle infestation in Four Notch. The objectives of the program would be to eradicate the beetle in the forest, to preserve as much of the pine stand as possible, to prevent the spread of the beetles onto private land, and to protect the red-cockaded woodpecker.

In 1984, Four Notch was eliminated as a potential addition to the Texas wilderness areas. In response, the Forest Service amended its environmental assessment for Four Notch. The amended environmental assessment described several methods by which the beetle could be controlled in the area, the forest replanted, and the woodpecker protected. By the time the infestation was eliminated, 2,600 acres of the Four Notch pine stand had been destroyed.

In 1985, environmentalists challenged the Forest Service's beetle control program in five Texas wilderness areas, including Little Lake Creek in the Sam Houston National Forest. *Sierra Club v. John R. Block,* 614 F.Supp. 134 (E.D.Tex.1985). The Sierra Club wanted the Forest Service to prepare a new EIS before it cut trees in order to prevent the spread of the beetle. The Sierra Club applied for a preliminary injunction to halt this activity until an EIS had been prepared. The district court denied the preliminary injunction, holding that the Forest Service reports, beginning with the 1978 EIS, demonstrated that the Forest Service objectively evaluated the environmental effects of the control program and that the Forest Service had examined the alternatives sufficiently to permit a reasoned choice.

In May of 1985, the Forest Service issued a second environmental assessment for Four Notch. It contained a detailed analysis for future reforestation of Four Notch once further beetle infestation had ceased. Various plans and the disadvantages of each were presented. The preferred alternative for restoring the forest was termed the "site preparation for artificial regeneration plan."

Faced with this large area of reforestation, the Forest Service planned to plant pine seedlings over the site. Between the planted pines and the volunteer hardwoods, the resulting forest should be two-thirds pine and one-third hardwood. Before planting, the site had to be prepared by (a) removing the few surviving pine trees, the formerly subcanopy hardwood trees, and encroaching brush, (b) shredding the debris from the dead pines and removing vegitation, and (c) controlled burning of the debris.

In October of this year, the Forest Service began the tree crushing operations in Four Notch. Approximately 1,500 acres have been razed. In early November, the state requested that the Forest Service stop the tree crushing operations for Texas

to determine whether it wished to pursue any legal action to halt permanently the Forest Service program. The Forest Service stopped for one week to allow the state to investigate. On November 13, 1986, the state filed this lawsuit.

*Issue.*

The scientists and conservationists who are advising the state eloquently describe alternative methods of reforestation and alternative selections among competing uses of the land. Specifically, the Forest Service has decided to replant mechanically for recreation and lumbering; the state would choose to allow reseeding naturally for scientific study. The question for the court, however, is not to choose the objectively correct or socially most compelling means to a new forest or use of the forest; the policy choices and the procedures for choosing among them have been confided by Congress to the Forest Service.

The only question for the court, then, is to determine whether the Forest Service violated the law in the manner it discharged its duties. The state has suggested one law that the Forest Service has broken: The National Environmental Policy Act, 42 U.S.C. § 4321. The state urges that NEPA requires a new, specific environmental impact statement for this project in Four Notch, instead of the Forest Service's reliance on the 1978 management plan and impact statement for the whole Sam Houston National Forest. Second, Texas contends that, at least, the Forest Service must be ordered to reconsider whether to prepare a new impact statement because the environmental assessment that it used to decide not to prepare an EIS was legally insufficient.

*Standard of Review.*

■ Courts within the Fifth Circuit must employ a reasonableness standard of review of agency actions. *Fritiofson v. Alexander,* 772 F.2d 1225, 1238 (5th Cir.1985). Although this standard is less deferential than the arbitrary and capricious standard employed in other circuits, agency determinations may not be overturned simply because the court might have decided differently on the same facts that were before the agency. The reasonableness test requires a district court to determine if the agency took a "hard look at the environmental concerns" of its decision. *Id.* at 1238.

A court, when reviewing an agency's decision, ensures that the agency did not act arbitrarily by examining the evidence on which the decision was based. One approach by which a court reviews agency decision making is to accept any agency decision for which there is any evidence in the administrative record; this standard is very deferential to agencies, allowing them to make any choice which is not clearly capricious. A second and higher level of evidence frequently required is that there be substantial evidence to support the agency decision. Substantial evidence is more than merely some evidence but less than a preponderance of the evidence.

■ Two problems exist in a court's use of these evidentiary requirements. First, under the guise of requiring substantial evidence, many courts have been reluctant to disturb agency decisions; substantial evidence, many times, means only some trace of evidence. Secondly, many agency decisions require a choice from among several competing policy alternatives, all of which are supported in the agency record but none of which is predominant. In these instances, to ensure governmental regularity, courts examine the record before the agency to ascertain that there was cogent enough evidence to support the choice that was made; the court must find that a fully-informed, disinterested person would determine that the choice made was not unreasonable.

■ Opening the evidence beyond the record would seem to require a preliminary finding that the administrative process had been deficient and that a remand for agency reconsideration is somehow inappropriate. In *Fritiofson,* the court of appeals appears to say that the evidence before the agency at the time the decision was made and the reasons that were articulated for

that decision may be later supplemented to demonstrate that the decision was lawful; however, the due process of the laws would clearly require that the evidence be known at the time of the decision and that the agency be limited to the justifications openly articulated at the time of the decision. *See, Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Hornsby v. Allen,* 326 F.2d 605 (5th Cir.1964).

■ Once a court determines that an agency had cogent enough evidence before it, a reviewing court may not order the agency to do more. If, however, the district court finds that the agency's decision was not based on cogent evidence, then the district court must remand the case for further agency action to comply with the law. The court may also simply order the preparation of an EIS if it determines that the evidence indicates that the Forest Service activities would indeed have a significant human impact not considered in previous Forest Service environmental impact assessments or statements.

*Standard for Temporary Relief.*

Before the Forest Service can be ordered to do anything, it must be afforded an opportunity to meet the state's attack on its compliance with the Act; however, if the Forest Service is not stopped until the trial can be heard, there will be no decimated forest in existence to allow to regenerate naturally. To keep the Forest Service from proceeding the state must show four things:[1] (1) it is probable that the state will succeed at the trial; (2) if no order stops the Forest Service, the state will suffer an injury that cannot adequately be redressed by money damages; (3) the probability of the harm to the state together with its magnitude exceeds the probable harm and its magnitude to the Forest Service as a result of the order stopping the site preparation until trial; and (4) the order stopping the Forest Service temporarily neither will (a) be against the general pub-

lic interest nor (b) adversely affect other people who are not parties to this litigation. *See, e.g., Canal Auth. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

*Likelihood of Success.*

■ For Texas to succeed on the merits, Texas must prove that the Forest Service violated the NEPA when it did not issue a separate EIS on the Four Notch reforestation project. The NEPA does not require that an EIS be issued for each instance of prospective Forest Service conduct. If it did, the Forest Service would be hard pressed actually to manage our forests. The NEPA does require that the Forest Service take careful, formal steps addressing the environmental impacts of its actions. 42 U.S.C. § 4332. It appears probable that this court will later conclude that the Forest Service has complied with the dictates of NEPA.

An EIS has been prepared for the forest. This 1978 report carefully analyzed the management plans for the forest and their impact on the ecology. Clearcutting up to 1,600 acres per year was authorized for Four Notch, and the effects upon soil, water, and animal life were discussed. Many of the groups objecting to the current operation participated in the formulation of the 1978 environmental impact statement and forest management plan. The court appreciates that their participation does not mean that their views prevailed or that they cannot now complain. Later, two environmental assessments were filed; the first detailed methods by which the beetle could be contained in Four Notch, and the second proposed the best method by which Four Notch could be reforested. In each of these environmental assessments, several alternatives were discussed, with the advantages and disadvantages of each analyzed.

The court of appeals has ruled that the 1978 EIS conforms with the dictates of the NEPA. *Tex. Comm. on Natural Resources v. Bergland,* 433 F.Supp. 1235

---

1. Although this case is before the court on an application for a temporary restraining order, the standards for a preliminary injunction will

be applied because the court gave the Forest Service a few days' opportunity to prepare.

(E.D.Tex.1977), *rev'd*, 573 F.2d 201 (5th Cir. 1978), *cert. denied*, 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978). The EIS, along with the first environmental assessment, has been held to demonstrate that the Forest Service had the alternatives and their effects before it when it chose its proposed method of containing the beetle. *Sierra Club, et al. v. Block, et al.*, 614 F.Supp. 134 (E.D.Tex.1985). These materials, along with the new environmental assessment on the alternatives by which Four Notch could be reforested, appear to this court to show that the Forest Service had substantial evidence behind its decision to implement the site preparation and artificial reforestation plan.

This analysis does not evidence the court's approval or disapproval of the Forest Service plan. The only judicial function is to decide whether the Forest Service made a decision upon proper documents and apparent reasonableness.

*Injury to the State.*

First, the state seeks to guarantee that the Forest Service follows congressional dictates when it acts upon land located within Texas. The state shares the citizen's right to require the national government's huge administrative apparatus to obey the laws applicable to it. Regularity is a principal component of legitimacy in government. *See* B. Bailyn, *The Ideological Origins of the American Revolution* 86 (1967); J. Ely, *Democracy and Distrust: A Theory of Judicial Review* 89 (1980).

■ Second, the state may legitimately articulate concerns about the method of land management employed by the Forest Service; however, these concerns are also limited to guaranteeing that the Forest Service follows the law. The state cannot impose additional requirements or otherwise control Forest Service management of its land. The state may, of course, participate in the policy process to the extent the National Forest Management Act of 1976 permits; once, however, the policy decision is made, the state may not attempt to impose another choice through litigation.

■ Without a doubt, the site preparation plan, if executed, will significantly change the character of the damaged areas in Four Notch. The remaining subcanopy hardwoods will be lost; the few eighty- to ninety-year-old pines unaffected by the beetle that remain will be lost. The red-cockaded woodpecker, which requires living stands of at least fifty-year-old pines to survive, will be affected. Most egregious, to the state, is that an opportunity to study natural reforestation processes will be lost if the Forest Service artificially regenerates Four Notch.

Since the state has no proprietary interest in the forest, its real interest in this case is an opportunity to convince the Forest Service to make a different selection among the policy choices for forest management in Four Notch.

The injury the state will suffer if the Forest Service is allowed to continue the site preparation, however, is not irreparable. If the state succeeds in this litigation, the Forest Service can be required to designate a portion of Sam Houston National Forest of equal or larger size and as nearly similar as possible in characteristics for preservation. Although Four Notch was unique because of the age of the pines located there, most of these pines were killed by the southern pine beetle or have now been leveled by the October tree crushing operations. The injury to the state in denying the application for a temporary restraining order can be compensated through post-trial adjustments in the management plans.

*Injury to the United States.*

Contrasted against these unquantifiable yet significant injuries to the state are converse injuries to the United States. The most important of these is the significant threat of accidental fire in Four Notch made more likely and more dangerous by the excess fuel from the dead and fallen trees. This conflagration, if it occurred, would affect Four Notch as drastically as the Forest Service site preparation plan and would destroy areas beyond the dam-

aged Four Notch region. Woodpecker habitat would also be destroyed. This risk of fire was one of the motivating factors in the Forest Service's decision to implement the site preparation plan.

Other injuries to the United States are less significant. The planting season is nearing, and if the site preparation is not completed soon, this year's planting opportunity may be lost. A temporary restraining order will, also, interfere with the Forest Service's orderly use of its resources and personnel. The Forest Service alleges that each day of delay in site preparation costs the United States over $2,000.

*Impact on Others.*

No diffuse public interest is disserved by not granting the temporary restraining order. Congress has given the Forest Service the responsibility to manage federal forests in the public interest. Presumptively, the Forest Service's decision to prepare Four Notch for reforestation through the site preparation plan is in the public's interest. It is beyond the responsibility of this court to determine whether the Forest Service made the best choice in the public interest. If the dictates of the NEPA, or more likely, the NFMA (16 U.S.C. § 1600) are disliked, they must be changed through congressional, not judicial, action.

If the Forest Service site preparation plan is stalled, some specific individuals may be injured. Those who own and operate the tree crushing machinery may be injured if the site preparation is delayed. Since the Forest Service claims that it loses money each day of the delay because it must pay the contracted price per contract day, any impact upon these people should be minimal. Other than these contracting parties, this court has been apprised of no secondary or tertiary contracts or rights that will be adversely affected by a temporary order. Although these people must exist, the impact upon them will also be considered minimal.

*Conclusion.*

The Forest Service had the appropriate evidence before it when it decided which alternative reforestation method to pursue.

The court in no way has decided that the Forest Service chose or failed to choose the best procedure for rejuvenating the Four Notch area. Some environmentalists may not agree with the Forest Service's decision, but, as the state admits, the wisdom of the decision is not at issue. It is the procedure by which the decision was reached that is in question.

The court considers that:

1. The state's likelihood of success on the merits: improbable

2. The injury to the state:
   a. Injury: governmental irregularity
   (1) Weight of affected interest: important
   (2) Likelihood of occurrence: improbable
   (3) Compensable: indirectly
   b. Injury: loss of opportunity to convince the Forest Service to preserve the naturally devastated forest
   (1) Weight of affected interest: marginal
   (2) Likelihood of occurrence: certain
   (3) Compensable: indirectly

3. The injury to the United States: delay, waste, fire danger
   a. Injury: waste and delay
   (1) Weight: marginal
   (2) Likelihood: probable-to-certain
   (3) Compensable: yes
   b. Injury: fire
   (1) Weight: critical
   (2) Likelihood: mid-range possibility
   (3) Compensable: only indirectly

4. Injunction's effect on others:
   a. The general public interest: not disserved
   b. Damage to third-parties: minimal.

On this analysis the remote chance of success on the merits erodes the state's

necessary foundation for relief at this early stage.